United States Court of Appeals,

Eleventh Circuit.

No. 97-9226.

Alan K. STANDARD, Jr., Plaintiff-Appellant,

v.

A.B.E.L. SERVICES, INC., Plaster Concepts, Inc., et al., Defendants-Appellees.

Dec. 3, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-CV-1196-JOF), J. Owen Forrester, Judge.

Before BLACK and CARNES, Circuit Judges, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

Appellant, Allen K. Standard, Jr., a Caucasian former employee of Plaster Concepts, Inc. ("Plaster Concepts") through A.B.E.L. Services Inc., brought an action against twelve defendants, five of whom were dismissed by the district court. The complaint alleges employment discrimination under 42 U.S.C. § 1981, Title VII, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and unlawful retaliation for the exercise and protection of his civil rights under the above statutes, based on his race, national origin, age and disability. Appellees moved for summary judgement, contending that Standard was not considered for a promotion and was later terminated for legitimate, nondiscriminatory reasons. The district court granted summary judgement on all counts, finding that Standard failed to establish a prima facie case under the ADA or show that Appellees' legitimate, nondiscriminatory reasons were pretextual. Because we conclude that Standard failed to establish a prima facie case under the ADA and the ADEA, or produce evidence sufficient for a reasonable jury to find pretext under Title VII

and § 1981, we AFFIRM the district court's order of summary judgement for defendants on all counts.

## I. BACKGROUND

A. *Facts*

1. Plaster Concepts

Plaster Concepts, Inc. is a business engaged in the production and sale of decorative architectural pieces, such as cornices, columns and ceiling panels. These pieces are produced by casting them from molds. The manufacturing process is performed by two different departments: the tooling department and the production department. The tooling department is responsible for crafting the molds that the production department uses to make the finished product. The molds can be made from various materials, such as wood, plaster, bondo, rubber and steel. The production of these molds requires a far greater level of skill than is required to cast the finished pieces. Some of the molds are made from scratch, but others are made by altering or combining pre-existing molds in a process known as mold setup.

Plaster Concepts leases most of its employees from A.B.E.L. Services, Inc. ("A.B.E.L."), an employee leasing company owned by Barbara Norsworthy, the wife of Plaster Concepts president, Paul Norsworthy. Standard was such a leased employee. Leased employees are interviewed and selected by Plaster Concepts, while A.B.E.L. is responsible for handling payroll, tax filings and insurance for the employees. Plaster Concepts pays A.B.E.L. for the employees' compensation package, as well as a fee for providing this service.

In the Spring of 1994, Plaster Concepts moved its production facility from Griffin, Georgia to East Point, bringing the plant closer to Atlanta. This move was motivated by several

2

considerations, including the deterioration of the Griffin plant and the benefits of proximity to Atlanta area customers and suppliers. In moving to East Point, management also hoped to draw from the larger labor pool in the Atlanta area. More specifically, Plaster Concepts wanted to target the Hispanic community and increase the number of Hispanic workers at the plant.

2. Standard is Hired by Plaster Concepts

Prior to the move to East Point, Plaster Concepts purchased most of its molds from outside sources. During this period, only one employee, James Carroll, was engaged in mold-making inside the company. At around the time of the move, in the spring of 1994, Plaster Concepts management decided that it would be more profitable to increase their in-house mold-making capabilities. Appellant Standard was hired as part of this plan. Standard was first interviewed by Harv Mier, and was brought back for a second interview with Don Grubbs and Mark Hicks. During the course of these interviews, Standard alleges that various members of management told him that they intended to staff the production facility with Hispanic workers. Management allegedly believed that Hispanic workers were more likely to work longer hours without complaint than other workers. Furthermore, Standard alleges that the fact that he spoke Spanish was a factor in the decision to hire him, because it would enable him to communicate with future Hispanic hires.

At the time that he was hired, Standard was 49 years old, and had no architectural mold-making experience. He did, however, have sufficient basic skills and wood-working experience that Plaster Concepts management felt he could be trained to become a proficient mold-maker. Standard began working in the tooling department with James Carroll in July of 1994.

3. Work Force Turnover at Plaster Concepts

3

It is undisputed that, even prior to the move to East Point, Plaster Concepts had a chronic problem retaining employees. Several months before the move, management changed its pay scheme from an hourly rate to a set payment per finished piece produced. After the plant moved to East Point and several days after Standard began working there, most of the workers ended their employment with Plaster Concepts in a dispute over the price set for production of a specific piece. The parties disagree about whether the terminations were called firings or resignations. All of the evidence shows, however, that after negotiations in which the price was raised the workers refused to work at the final price offered. One of the workers who left at this time was James Caroll, Standard's fellow Caucasian tooling department worker. Caroll was rehired shortly after he left.

This mass exodus of employees brought production to a near standstill, requiring a massive hiring effort. During this effort, Plaster Concepts specifically targeted the Hispanic community. Ads were placed, both in English and in Spanish, in bilingual newspapers. Furthermore, the answering-machine message was changed to include both Spanish and English messages, with only the Spanish message discussing the application process.

4. Plaster Concepts Hires a Production Supervisor

A few months after Standard was hired, Plaster Concepts decided to hire a manager to assist in supervising the production department. Standard alleges that he indicated interest in the position, but was never actively considered for the job. He also admits that he had recently been hired into the tooling department without having architectural mold-making experience, that he was in the process of being trained in mold setup and mold-making, and that it was difficult to find skilled workers suitable for the tooling department. It is also undisputed that management wanted to hire a manager out of the military, with experience supervising and motivating unskilled workers, such

4

as those in the production department. Consequently, the position was advertised in military publications.

Ultimately, Enrique Torres was hired as production supervisor. Torres is a bilingual Hispanic-American citizen, who had recently retired from the Army with twenty years experience as a sergeant. Standard alleges that he was passed up for the supervisor position because of racial and national origin discrimination. His only evidence of this discrimination is his own allegation that Mark Hicks made the statement that Standard was not considered for the position because he "A, was not Hispanic; B, not ex-military; and C, they needed a tool maker, couldn't spare me." Standard concedes that when he initially inquired about the position, Don Grubbs told him that Steve Norsworthy had decided to only consider candidates with a military background. It is also undisputed that Mark Hicks was not involved at any stage of the hiring process for the production supervisor position.

5. Plaster Concepts Further Expands the Tooling Department

During the same period of time that Torres was hired, the fall of 1994, Plaster Concepts decided to further expand the tooling department. Management hired Freddie Kinney, a Caucasian who was only two years younger than Standard. Similar to Standard, Kinney had no architectural mold-making experience, but he had over twenty years experience in metal fabrication. Standard admits that Plaster Concepts hired Kinney, in part, because they planned on using more metal fabrication in the tooling department. Kinney's hire brought the tooling department's staff up to three workers, all of them Caucasian Americans.

In January, 1995, Elias Thiers, a Chilean citizen, applied for a job at Plaster Concepts. In contrast to all of the other tooling department workers, Thiers had nine years of mold-making

experience and also had an impressive portfolio of past work. Thiers was in the United States on a tourist visa, and therefore was ineligible to become an employee. He was so potentially valuable to the tooling department, however, that Plaster Concepts gave him work as an independent contractor while sponsoring him for a work visa. After Thiers was granted a work visa, Plaster Concepts hired him as an employee.

6. Standard's Back Injury

In February, 1995, Standard injured his back while moving a heavy mold. The injury included several herniated discs. Standard had to make several appointments with a doctor and a physical therapist for treatment of this injury. He alleges that the doctor recommended that he schedule his doctor appointments directly after his therapy appointments. Plaster Concepts requested that Standard schedule his appointments late in the workday in order to minimize the amount of time lost at work. Standard's workday ended at 3:30, and the doctor's office closed at 5:00. Instead of scheduling his appointments for the late afternoon, however, Standard scheduled them for the middle of the day. Because Standard did not make up any of his lost time, the tooling department began to fall behind schedule. At this point, Plaster Concepts called the physical therapist and rescheduled two of Standard's appointments. As was company policy, Plaster Concepts did not pay Standard for the time missed due to doctor's appointments.

At the same time as he was seeking treatment and therapy for his injury, Standard began taking short breaks during the day to do stretching exercises for his back. His supervisor, Don Grubbs, told him that such breaks would be permitted, but that he had to clock out on his time card for them. Standard failed to do so, and was written up for the violation. Standard also requested special assistance with heavy lifting during this time. Standard claims that he was denied this

6

assistance, but admits that management agreed to give it to him and further admits that co-workers gave him help every time he requested it.

After July, 1995, Standard stopped his physical therapy. His doctor, after reviewing M.R.I. films, suggested that he could try stopping the treatment and that the problem could alleviate itself. Standard claims that after one month without treatment the pain worsened, but that he could not resume treatment because his insurance company had gone bankrupt and he could not afford to pay the doctor. After this time, Standard did not miss another day as a result of his back injury, and he maintains that he remained capable of performing his work up through the time that he was terminated. He alleges, however, that his condition has worsened since his termination and that he is no longer capable of working.

7. Standard's Work Record

Between the time of his injury and the date of his termination, Standard received several write-ups indicating problems with his job performance. Some of the disciplinary write-ups concern problems stemming from mold-making blueprints. Plaster Concepts maintains that Standard was having difficulty reading or understanding the blueprints, while Standard alleges that the blueprints were defective and were used to set him up for disciplinary action. Other write-ups are undisputed, such as one stemming from an incident in which Standard shot Elias Thiers, several times, in the leg with a high-powered staple gun.

8. Reduction in Force

Towards the end of 1995, Paul Norsworthy, president of Plaster Concepts, anticipated a drop in business due to the expiration of several large contracts in December. In order to prepare for this drop in business, Norsworthy decided that the number of staff would have to be reduced by four

workers in the production department and one worker in the tooling department. The task of choosing the specific workers to be laid off was given to Steve Norsworthy for the production department and Don Grubbs for the tooling department.

Grubbs testified that he considered the skill sets of each member of the tooling department in order to select the worker whose departure would cause the least drop in productivity. Grubbs felt that James Carroll was the best of the four at making molds with epoxy, rubber and plaster. It is undisputed that Carroll was also engaged in research and development for various new materials and finishes for the architectural pieces, and was the only worker doing so. Freddie Kinney had over twenty years of metal fabrication experience, and was able to do work useful outside of the tooling department, such as welding and forklift operation. Standard admits that Plaster Concepts was increasing its use of metal in mold-making. Kinney was also able to do mold setups and produce basic wooden molds. It is undisputed that Elias Thiers had years of mold-making experience before he began working at Plaster Concepts. Standard admits that Grubbs considered Thiers a better mold-maker than Standard. Grubbs and Steven Norsworthy both testified that Thiers was more skilled in woodworking than Standard. Standard has offered no evidence to refute that testimony.

Standard alleges that he trained Thiers in how to do his job. On closer examination, this alleged training consisted mainly of helping Thiers adjust to the differences between working in Chile and America, such as help with English so that he could understand the blueprints better and helping Thiers' transition from the metric system. Plaster Concepts alleges that Standard refused to learn new mold-making techniques, and this resistance to adaptation made him less useful to the company. It is undisputed that Standard was qualified to be a mold-maker at the time of his

8

termination. Plaster Concepts maintains that he was the least valuable qualified tooling department employee, and was therefore laid off on December 28, 1995.

Shortly before the time of his layoff, Standard alleges that he walked in on a conversation between Grubbs and Steve Norsworthy, in which Norsworthy said that "older people have more go wrong." Standard did not hear any of the conversation immediately before or after this statement, and so cannot provide any context for it. He advances this statement as evidence of age discrimination.

9. EEOC Complaint

On January 20, 1996, Standard filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging national origin and race discrimination. A.B.E.L. responded by claiming that Standard was dismissed as part of a reduction in force due to lack of work, while more qualified employees were retained. During the course of the EEOC investigation, layoff worksheets were provided, purporting to document the evaluation process that Don Grubbs went through while deciding who from the tooling department to let go. Grubbs produced these documents after the EEOC investigation began, but he back-dated them, listing the date that he claims he originally discussed the evaluations orally with Paul Norsworthy. Ultimately, the EEOC entered a determination of "no cause."

B. *Procedural History*

On May 14, 1996, after receiving notice of the impending no cause determination, Standard commenced this action in the United States District Court for the Northern District of Georgia. He alleged employment discrimination under 42 U.S.C. § 1981, Title VII, the ADEA, the ADA, and unlawful retaliation for the exercise and protection of Appellant's civil rights under the above

statutes, based on his race, national origin, age and disability. The district court granted Appellees' motion for summary judgement, holding that the Title VII and ADEA failure to promote claims were time barred, that Standard failed to satisfy the prima facie case for the ADA, that he failed to present any evidence of retaliatory discharge relating to Title VII or the ADEA, and that his failure to introduce proof of a disability under the ADA was also fatal to his ADA retaliation claim. On the ADEA and Title VII discharge claims and the § 1981 claim, the court held that once Appellees offered legitimate non-discriminatory reasons for the employment actions, Standard did not introduce evidence sufficient to allow a rational jury to find the reasons pretextual.

Standard filed notice of appeal on October 27, 1997, and we have jurisdiction pursuant to 28 U.S.C. § 1291. He does not appeal the dismissal of the Title VII and ADEA failure to promote claims or the retaliation claims based on Title VII, § 1981 or the ADEA. We are, therefore, left with the termination claims based on Title VII, § 1981, the ADEA and the ADA, as well as the § 1981 failure to promote claim and the ADA retaliation claim.

## II. STANDARD OF REVIEW

We review grants of summary judgement *de novo,* using the same legal standard as the district court. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1374 (11th Cir.1996). Summary judgment is appropriate when the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In making this assessment, we must view the evidence in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992).

## III. DISCUSSION

A. *Disability Discrimination and Retaliation*

Standard alleges that he was discriminated against on the basis of his back injury, in violation of the Americans with Disabilities Act. The ADA prohibits discrimination against a qualified individual with a disability based on that disability when the discrimination involves the hiring, advancement, termination or conditions of employment of that qualified individual. 42 U.S.C. § 12112(a). Under the ADA rubric of discrimination, an employer must make reasonable accommodations that allow a disabled individual to perform her job, unless that accommodation would cause an undue hardship. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 519 (11th Cir.1996); 42 U.S.C. § 12112(b)(5)(A). A disability, for the purposes of the ADA, is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

1. Discriminatory Termination

In order to state a claim for wrongful termination under the ADA, a plaintiff must first prove that he has a disability, as defined by the Act. *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 910 (11th Cir.1996), *cert. denied,* --- U.S. ----, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997). Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act. *Id.,* at 911. Standard has failed to argue or present evidence that his back injury substantially limited any of his major life activities under the ADA. Even after the district court ruled that he had failed to produce evidence of disability, Standard neglected to argue the issue in his Appellant's Brief. Finally, in his Reply Brief, Standard points to a statement that he alleges Susan Morgan made about his ability to perform his job after

11

the injury. Although he did not address the legal standard for disability or major life activity, we will assume that he was arguing that the major life activity at issue is working.[1]

Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job. 29 C.F.R. § 1630.2(j)(3)(i). Instead, the impairment must significantly restrict "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* Standard does not explicitly argue that his back injury significantly restricted his ability to work. In fact, he admits that he was fully capable of performing his job at all times that he was employed by Plaster Concepts. Therefore, he cannot be considered disabled by virtue of § 12102(2)(A) of the ADA.

In his Reply Brief, Standard seems to expand his argument to assert disability under § 12102(2)(C), which applies to individuals who are regarded as being disabled, as defined in the ADA[2]. Under this provision, the impairment must also be perceived to substantially limit a major life activity. This "regarded as" provision is "intended to combat the effects of archaic attitudes,

---

[1]Although the ADA does not explicitly define the term "major life activity," we are guided by EEOC regulations. The ADA regulations adopt the definition set forth in the Rehabilitation Act regulations. 34 C.F.R. § 104. Major life activities are defined as " functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R § 1630.2(I).

[2]Standard does not cite any provision of the ADA, but merely asserts that he was perceived by defendants to be disabled under the ADA without explaining the legal significance of this allegation. The only way that this fact might be significant is under § 12102(2)(C). The applicable regulations make clear that this provision applies only to an individual who (1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA. 29 C.F.R. § 1630.2(*l* ).

12

erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." *Gordon,* 100 F.3d at 913.

The only evidence Standard points to is his claim that Susan Morgan, an administrative staff member at A.B.E.L., made a statement regarding his ability to perform his job. He claims that when he contacted the A.B.E.L. office about recording mileage driven for medical appointments, Morgan "said that she felt that [he] wasn't able to do [his] job anymore, and ... perhaps [he] wasn't fit for [his] job anymore." Standard does not explain how this proves that his employer regarded him as disabled under the ADA. There is no evidence that Morgan had any authority to make decisions for A.B.E.L., much less Plaster Concepts. It is difficult, therefore, to see how this statement evinces an erroneous or archaic attitude that would disadvantage someone wrongly suspected of being disabled. Indeed, after Morgan made her statement that "perhaps" he was not fit for his job, Standard immediately replied that he was currently performing his job without problems. This ended the inquiry, and there is no evidence that anyone ever inquired further into Standard's ability to work in light of his injury. Furthermore, it is uncontested that all of the decision makers at A.B.E.L. and Plaster Concepts considered Standard's back injury to be a temporary condition.

Given the tentative nature of Morgan's alleged statement, her position relative to Standard's employment, and the evidence that all of the decision makers perceived Standard as having a temporary injury, we hold that Standard has failed to present sufficient evidence to allow a rational juror to find him disabled under § 12102(2)(C) of the ADA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADA wrongful termination claim.

2. Retaliation

In order to establish a prima facie case of retaliation under the ADA, Standard must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir.1997). "[W]e assess ADA retaliation claims under the same framework we employ for retaliation claims under Title VII." *Id.* Therefore, to satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute. *See, e.g., Clover v. Total Sys. Servs., Inc.,* 157 F.3d 824, 827 (11th Cir.1998)(employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998)(employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

In this case, Standard argues that his requests for accommodation of his back injury constitute statutorily protected activity. In this context, it would be sufficient for him to show that he had a good faith, objectively reasonable belief that he was entitled to those accommodations under the ADA. He cannot show this, however. Standard has not produced any evidence that, at the time that he requested accommodations for his back injury, his belief that he was disabled was objectively reasonable. He merely asserts that his back injury was a disability, without any grounds for the conclusion. As discussed, *supra,* the mere existence of a physical impairment does not constitute a disability under the ADA; the impairment must substantially limit a major life activity. *Gordon,* 100 F.3d at 911. In determining whether an injury substantially limits a major life activity, we consider "(1) the nature and severity of the impairment; (2) the duration or expected duration

14

of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(I)). Standard has not introduced any evidence that his doctors, or anyone else, gave him reason to consider his back injury as impairing his ability to work in a long term or permanent way. In fact, he was taking physical therapy in order to improve his condition. Don Grubbs testified that Standard initially did not want to go to the doctor on the day of his injury, and had to be told to go anyway. Grubbs also testified that on return to work after going to the doctor, Standard told him that he was fine, and that the doctor wanted to continue to see him. This testimony is not disputed.

The only evidence that Standard points to as establishing his disability is, once again, the statement by Ms. Morgan, a secretary for A.B.E.L., relating to his ability to perform his job. Standard argues that this statement proves that, at that time, his employer perceived his injury as being permanent. This argument fails for two reasons. First, as discussed *supra,* the tentative nature of her statement and her position relative to Standard's employment undercut any argument that he reasonably believed that he was perceived as disabled by his employer. Second, this statement was made after he requested accommodation. Therefore, it could not have been the basis for his belief that he was disabled under the ADA at the relevant time.

In summary, Standard has not introduced any evidence that would allow a rational fact finder to conclude that his belief that he was disabled under the ADA was objectively reasonable. He cannot, therefore, establish the first element of the prima facie case. *See Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1096-97 (7th Cir.1998), *cert. denied,* --- U.S. ----, 119 S.Ct. 164, --- L.Ed.2d ---- (1998)(affirming summary judgement for defendant when plaintiff's belief that employee was disabled, as defined by the ADA, was not reasonable). Because Standard has failed

15

to present evidence sufficient to allow a fact finder to rationally conclude that he was retaliated against under the ADA, we must affirm the district court's grant of summary judgement for defendants on the retaliation claim.

B. *Age Discrimination*

Standard alleges that he was terminated because of his age, in violation of the ADEA. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to make a prima facie case of age discrimination for a reduction in force termination, Standard must prove that (1) he was a member of the age group protected by the ADEA at the time of his termination; (2) he was qualified at the time of his termination; and (3) there is evidence from which a reasonable fact finder could conclude that the employer intended to discriminate on the basis of age in making the decision. *Jameson v. Arrow Co.,* 75 F.3d 1528, 1532 (11th Cir.1996). Neither party disputes that Standard has proved the first two prongs of this test. At issue is whether Standard can point to sufficient evidence to allow a reasonable juror to find discriminatory intent.

The only evidence of discriminatory intent that Standard points to is a part of a conversation that he claims he overheard between Don Grubbs and Steve Norsworthy. Standard walked into a room in the middle of a sentence in which Norsworthy said "older people have more go wrong." Standard did not hear any other part of the conversation. The district court found that a reasonable

16

juror could find that this proved a discriminatory animus in upper management, which could have influenced the termination decision. We disagree.[3]

First, the conversation fragment, devoid of any meaningful context, is simply too vague to prove even generalized discriminatory animus. We simply have no way of knowing what Steve Norsworthy was talking about. In the light most favorable to Standard, it states a general proposition that old age brings on health complications. There is no nexus to employment issues, nor is it clear what range of old age was being discussed. Without any other circumstantial evidence, it is not probative of employment-related animus.

Second, it is undisputed that Steve Norsworthy was not involved in the decision to terminate Standard. His brother, Paul Norsworthy, made the decision to reduce the work force, and Don Grubbs decided which of the four tooling department employees to terminate. This statement by Steve Norsworthy, even if it had been uttered in the context of employment issues, is not probative of a discriminatory intent behind Standard's termination. *See Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir.1987)(holding that company vice president's statement, "The Hardy Corporation was going to weed out the old ones" did not present a genuine issue of material fact as to discriminatory intent when the vice president played no part in the decision to terminate plaintiff and had no knowledge of the decision making process); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 610-11 (11th Cir.1987)(holding that plaintiff did not establish a prima facie case by

---

[3]After holding that Standard satisfied, for the purpose of avoiding summary judgement, the prima facie case, the district court went on to grant the summary judgement against Standard. The court held that he failed to show that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts for the termination were pretextual. Assuming, arguendo, that Standard had made the prima facie case, we agree that he failed to show pretext, for the same reasons stated in our Title VII analysis, *infra.*

introducing personnel manager's statement, "You would have to take another physical examination and at your age, I don't believe you could pass it."). Because this fragment of a conversation is insufficient to allow a rational juror to find that Plaster Concepts intended to terminate Standard because of his age, Standard has failed to establish a prima facie case under the ADEA. We must, therefore, affirm the district court's grant of summary judgement for defendants on the ADEA claim.

C. *Race and National Origin Discrimination*

1. Termination in Violation of Title VII and § 1981

Standard alleges that he was terminated on the basis of his race and national origin (Caucasian-American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well. In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen. If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent. *Wall v. Trust Co. of Georgia,* 946 F.2d 805, 809 (11th Cir.1991).

Standard argues that he has provided direct evidence of discriminatory intent by pointing to three alleged statements made by various members of management. The first was Harvey Mier's affidavit stating that Paul Norsworthy wanted him to hire only Hispanics. The second was a statement made to Standard by either Don Grubbs or Mark Hicks, before Standard was hired,

18

indicating a desire to staff the production plant with Hispanic workers. The third was a statement by Hicks that one of the reasons Standard was not considered for a promotion was because he was not Hispanic. The district court held that none of these statements constituted direct evidence, and we agree.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. *Carter v. City of Miami,* 870 F.2d 578, 580-81 (11th Cir.1989). Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination. *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990). Of the three statements, only the second might have been made by a decisionmaker, and only if it was made by Grubbs and not Hicks. Assuming for the purposes of summary judgement that it was Grubbs, any direct link between the statement and discriminatory intent against Standard is broken by the simple fact that Standard was hired, on Grubbs's recommendation, after Grubbs made the statement. Furthermore, all three statements referred to hiring practices for production department positions, whereas Standard was fired from the tooling department. Although these statements may constitute direct evidence of discriminatory intent in refusing to hire production workers at those times, one must infer that the same discrimination applied to the tooling department positions at a significantly later date if they are relevant to Standard's discharge. *See Kier v. Commercial Union Ins. Co.,* 808 F.2d 1254, 1259 (7th Cir.1987)(holding that evidence of discriminatory intent in hiring for a different position is not direct evidence of discriminatory intent regarding plaintiff's termination, but may be circumstantial evidence); *Atkin v. Lincoln Property Co.,* 991 F.2d 268, 272 (5th Cir.1993)(holding that a demotion accompanied by employer's statement that plaintiff was "getting up there in years" and should retire

19

was not direct evidence of age discrimination when he was terminated almost one year later). Because all of these statements require some inference or presumption, they do not constitute direct evidence, but may constitute circumstantial evidence.

When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual. *Id.,* at 802-04, 93 S.Ct. at 1824-25.

Because this case involves a discharge as part of a reduction in force, Standard may establish a prima facie case of discrimination by (1) showing that he was a member of a protected group and was adversely affected by an employment decision; (2) proving that he was qualified for his own position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision. *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1208 (11th Cir.1997). It is undisputed that Standard has satisfied the first two prongs of the prima facie case. He is a Caucasian-American and was terminated from his employment. It is not disputed that he was qualified to perform his job at the time of the discharge. The district court also found that Standard satisfied the third prong, although just barely. For our purposes, we will assume that he established the prima facie case.

20

Once Standard established his prima facie case, Plaster Concepts needed to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for Standard's discharge. This is a burden of production, not persuasion. Plaster Concepts need only produce evidence that could allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In this case, Plaster Concepts asserts that a drop in business necessitated a reduction in force. As part of this reduction, one of the four members of the tooling department had to be discharged. Although Standard was qualified, Don Grubbs felt that he was the least valuable to the company when compared to the other three. Specifically, Grubbs determined that (1) James Carroll was valuable for his research and development work and was the best at making molds with epoxy, plaster and rubber; (2) Freddie Kinney was best at mold setups and had twenty years of metal working experience, at a time when Plaster Concepts was expanding its use of metal in molds; (3) Elias Thiers was the a better overall mold-maker than Standard, having had years of mold-making experience before he began working at Plaster Concepts as opposed to Standard, who learned entirely on the job; and (4) Standard had no unique skills compared to the others, was less talented in his primary area of expertise (wooden molds) than Thiers while the use of wooden molds was decreasing, resisted learning to work with new materials, was not as hardworking as the others, and had disciplinary problems that the others lacked. These detailed reasons, if believed, are certainly sufficient to allow a rational fact finder to conclude that Standard's discharge was not made for a discriminatory reason.

By presenting legitimate, nondiscriminatory reasons for Standard's termination, Plaster Concepts has rebutted the presumption of discriminatory intent. In light of this, Standard must now

21

create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, Standard must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. *Combs,* 106 F.3d at 1538. Standard may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996)(quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

Standard takes the first approach, arguing that the proffered reasons should not be believed because the reasons have shifted over time and have included misrepresentations. First, Standard claims that the initial reason offered for the discharge, that he was least qualified, was later changed to dissatisfaction with his job performance. However, the evidence that Standard was slow, resistant to change, error-prone, and had disciplinary problems was not provided as a new reason for the discharge. Instead, it was used as later elaboration on the reasons he was less qualified than the other three tooling department workers, who did not have these problems. Such explanation of a general reason is insufficient to show pretext. *Id.,* at 1377 (holding that plaintiff failed to show pretext when the employer's later statements merely offered more detail regarding perceived performance problems). Standard also asserts that many of the negative write-ups he received were unwarranted or based on errors that were not his fault. He does not dispute the validity of some of the more serious write-ups, however, including an incident in which he shot Elias Thiers in the back of the leg with a high powered staple gun. He also does not dispute that all of the mistakes that are the subject of the write-ups did actually happen, nor does he introduce any evidence that he was set

22

up to make those mistakes. Therefore, Standard has failed to show that Plaster Concepts' evaluation of his job performance was pretextual.

Standard also asserts that Plaster Concepts engaged in a pattern of misrepresentations before the EEOC. Specifically, he claims that the initial response stated that Standard was the least qualified of four "mold-makers" when, in fact, there is evidence that only two of the four were technically given the job title of mold-maker. However, he does not dispute that there were four workers in the tooling department and that the person to be discharged was to be chosen from those four workers. The district court found that his kind of minimal, technical discrepancy is insufficient to show pretext, and we agree. Standard further asserts that Plaster Concepts' statement to the EEOC, that two similarly situated Caucasian-Americans were retained in the tooling department, was a lie. He does not explain why this was a lie. Such a naked assertion is not evidence of pretext, especially when the uncontroverted evidence suggests that the statement was in fact true.

Finally, Standard focuses on the fact that Plaster Concepts submitted a series of layoff worksheets to the EEOC, explaining the evaluation process that Don Grubbs went through when making the discharge decision. Although Grubbs wrote out the sheets after the EEOC charges were instituted, he back-dated them to the time that the evaluation process occurred, giving the impression that the worksheets were written contemporaneously with the evaluation process. This fact, in isolation, could be seen as evidence that the reasons listed on the worksheets were made up after the decision was made, and therefore pretextual. However, Standard either admits or fails to dispute the truth of virtually all of the evaluations listed on the worksheets. Instead of disputing the truth of Grubbs' evaluations, he focuses on his own belief that he was objectively as qualified as Elias Thiers even though he admits that Thiers had nine years of mold-making experience and that Grubbs

23

considered Thiers to be a superior mold-maker. This argument must fail. The pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs. *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997)(holding that when employer produces negative performance reviews, employee's assertion of his own good performance is insufficient to defeat summary judgement). Standard cannot show that the reasons listed on the worksheets are pretextual when he admits their truth, even if the forms are back-dated. The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons. Once Standard admitted that the other tooling department employees either had the superior qualities attributed to them or were perceived as having them by Grubbs, he can not establish pretext merely by disagreeing with the evaluations or by pointing out the back-dating.

In order to directly attack Plaster Concepts' reasons, Standard must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." *Combs,* 106 F.3d at 1538. Standard has failed to produce such evidence, and so has failed to prove that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts are merely pretext. Therefore, we must affirm the grant of summary judgement for defendants on the Title VII and the § 1981 wrongful discharge claims.

2. Failure to Promote in Violation of § 1981

In addition to his discharge, Standard alleges that he was not considered for a promotion because of his race and national origin, in violation of 42 U.S.C. § 1981. A few months after Standard was hired and began training as a mold-maker in the tooling department, Plaster Concepts

24

decided to hire a manager for the production department. The company focused its search on bilingual persons with military backgrounds, with experience supervising and motivating unskilled workers. Although Standard mentioned his interest in the position, he was never considered for the job and was immediately told by Don Grubbs that they were looking for someone with a military background. Ultimately, Enrique Torres was hired for the supervisor's job. He had twenty years of military experience as a sergeant.

Standard alleges that Mark Hicks told him that he was not considered for the position because he "A, was not Hispanic; B, not ex-military; and C, they need a tool-maker, couldn't spare me." Standard, again, claims that this statement constitutes direct evidence of Plaster Concepts' discriminatory intent. Again, we disagree. Steve Norsworthy was responsible for the decision of who was promoted, and there is no evidence that Hicks was involved in the decision or even talked to Norsworthy about the decision. As speculation of a non-decisionmaker, this statement is circumstantial evidence at best.

In the absence of direct evidence, we must proceed with the *McDonnell Douglas* analysis used above for the Title VII claim. Because this claim is based on a failure to promote rather than a reduction in force termination, however, the requirements for a prima facie case are slightly different. To establish his prima facie case of discriminatory failure to promote, Standard must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position. *See Coutu v. Martin County Bd. of County Commissioners,* 47 F.3d 1068, 1073 (11th Cir.1995). Under this framework, the district court found that Standard established a prima facie case, and we agree. He is in a protected group, as a Caucasian-American, and he suffered an adverse employment action

25

when he was not considered for the supervisor's job. Plaster Concepts does not dispute that he was qualified for the job, and the person ultimately hired was Hispanic. Having established a prima facie case, Standard is now entitled to a rebuttable presumption of discriminatory intent on the part of Plaster Concepts.

To rebut this presumption, Plaster Concepts must advance legitimate, nondiscriminatory reasons why Standard was not considered for the job. The first reason they advance is that Standard had recently been hired into the tooling department, without experience making architectural molds. Standard admits that in contrast to production department workers, tooling department workers are highly skilled and difficult to find. The company had already invested in training Standard, and this investment would be wasted if he were transferred to the production department. Furthermore, Plaster Concepts argues, they were already short-staffed in the tooling department, and could not afford to lose Standard. The second reason advanced is that management had decided to hire someone with a military background, and Standard did not have one.

Faced with these legitimate, nondiscriminatory reasons, Standard must now show that they are pretextual. However, Standard has not presented any particular evidence tending to discredit the proffered reasons. He relies on the same evidence he has introduced for his prima facie case, specifically that Plaster Concepts hired a Hispanic production supervisor and the statement allegedly made by Hicks. This evidence falls far short of establishing pretext in light of the proffered nondiscriminatory reasons. "[A] plaintiff may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant." *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987). The fact that an Hispanic was hired does not make discriminatory animus a more likely motivating force in this case, because Torres, besides

26

being Hispanic, also had the attributes listed as lacking by Standard in the proffered reasons: (1) Torres was not hired, trained or needed in the tooling department; and (2) he had twenty years of military supervisory experience. Likewise, Hicks's statement regarding the reason Standard wasn't considered, even though it is the speculation of a non-decisionmaker, actually supports the two legitimate reasons advanced by Plaster Concepts.

Standard has failed to produce evidence sufficient to allow a rational fact finder to conclude that the legitimate, nondiscriminatory reasons advanced by Plaster Concepts are unworthy of belief. Therefore, we must affirm the grant of summary judgement for defendants on the § 1981 failure to promote claim.

## IV. CONCLUSION

After addressing each of Plaintiff-Appellant's claims in detail above, we agree with all of the district court's conclusions. We therefore AFFIRM the grant of summary judgement for Defendants-Appellees on all counts.

27