Shanie ALPERT, Plaintiff,

v.

**DEKALB OFFICE ENVIRONMENTS, INC., Defendant.**

Civ. A. No. 1:00–CV–283–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 25, 2001.

Shanie Alpert, Roswell, GA, pro se.

Randy C. Gepp, Arrington & Hollowell, Atlanta, GA, for defendant.

## ORDER

THRASH, District Judge.

This is an action brought pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* It is before the Court on Defendant's Motion for Summary Judgment [Doc.20]. For the reasons set forth below, Defendant's motion is granted.

## I. BACKGROUND

Plaintiff was employed by Defendant between May, 1998, and July, 1999, as a sales support coordinator. Defendant is a Georgia corporation with its principal place of business in Atlanta, Georgia. It is engaged in the business of providing office furniture, space planning, installation, warehousing, and similar services to metropolitan Atlanta and North Georgia businesses.

The pertinent facts of this case viewed in the light most favorable to Plaintiff are as follows. Plaintiff applied for a job with Defendant in May, 1998. Before being hired, Plaintiff interviewed with Susan Stackhouse, DeKalb Office Environment's Administrative Support Manager, and Heather Butler, the company's Human Resources Manager. During the interview, Plaintiff informed Stackhouse and Butler that she had injured her knee a few years ago and was expecting to undergo surgery in the near future. She explained that there would be a lengthy recuperation period during which she would need to be out of work. She stated that upon her return to work, she would be unable to wear shoes other than tennis shoes, specifically white Keds, for a period of time to be specified by her personal physician. She

also informed Stackhouse and Butler that she might require additional surgeries, depending on the success of the upcoming surgery. Stackhouse and Butler assured Plaintiff that her condition was not a problem and that the company would work with her during those periods of time. Plaintiff eventually was offered a position and accepted the offer.

At the time of Plaintiff's employment orientation with DeKalb Office Environments, she was provided a copy of the company handbook. The handbook explained requirements for office dress as follows:

> Associates should wear apparel appropriate for the jobs they perform and the audience we serve. Associates should always dress in a businesslike manner. "Business Casual" attire is acceptable five days a week. "Business Casual" includes clothing in good taste for a business environment—such as slacks, dresses, suits, blouses, men's collared shirts, sweaters, vests, blazers, and sports coats. "Home or Weekend Casual" clothing, such as shorts, tank tops, jeans, sun dresses, T-shirts with advertising, casual sandals, men's shoes without socks, warm up suits, sweatshirts, and running shoes, is not appropriate for the business setting. Associates who have been issued uniforms should wear these at all time.

(Defendant's Motion for Summary Judgment, Ex. 1, at 4.11.) [Doc. 20] A few months later, in July, 1998, the company updated its dress code. For non-uniformed associates, of which Plaintiff was one, the requirements were as follows:

1. Non-uniformed associates should dress with "good business taste" and in clothing appropriate to their positions.

2. "Business casual" attire is the company's dress code policy and is applicable Monday through Thursday, during regularly scheduled business hours and/or during business functions.

3. Business casual is defined as clothing in "good taste" for a business environment which includes slacks, dresses, suits, blouses, collared shirts, sweaters, vests blazers, sports coats, or other generally business-like attire.

4. Good business taste does not include jeans (except on Fridays), tank tops, T-shirts with advertising, sweatshirts, warm up suits, athletic sportswear, sundresses with spaghetti straps, shorts or skorts made of denim or all cotton material, athletic shoes, or other generally recognized casual or weekend attire.

5. Shorts and/or skorts of fine fabric (rayon, linen, silk, etc.) may be worn if done so with hosiery and dress shoes. Socks must be worn with men's shoes.

6. Company issued sportswear, which includes T-shirts and/or collared shirts, and outerwear, bearing the company logo, may be worn at the associate's discretion if done so within the standards of dress policy.

7. "Casual Friday" attire is permitted on Fridays only and includes appropriate jeans, casual sportswear and footwear, and any "business casual" clothing described above. Casual Friday attire does not include faded, torn, cut-off, or otherwise worn out or tightly fitting jeans.

(*Id.* at Ex. 2.) [Doc. 20]

Plaintiff was scheduled for knee surgery in September 1998. Plaintiff informed Stackhouse that she would be away from work recuperating for six to eight weeks. Despite the fact that Plaintiff had been employed with DeKalb Office Environments for only four months, Stackhouse approved Plaintiff's request for time off. Plaintiff underwent surgery on September 29 and remained out of work until October

19, three weeks after the surgery. Defendant emphasizes that Plaintiff's personal physician cleared her to return to work with no substantial limitations on her ability. Plaintiff, however, contends that Stackhouse specifically asked her to return only three weeks after her surgery, even though she had been advised to spend six to eight weeks out of work. Dr. Haber was reluctant for Plaintiff to return to work this soon but ultimately allowed her to do so on a limited basis. Plaintiff says that she agreed to return to work so soon because she and Stackhouse had become very good friends.

Upon her return to work, Plaintiff did not wear normal work clothes for a period of time while she was outfitted with a knee immobilizer. During this period, Plaintiff also was required to keep her knee elevated and on ice, to wear shorts, and to walk on crutches. She was unable to perform various functions of her position, such as making photocopies. Stackhouse excused plaintiff from performing such functions and performed them herself during this period. Nevertheless, Plaintiff was present at work for only 11 days between October 19 and November 16, 1998. Eventually, Stackhouse and Human Resources Manager Ellen Warthen counseled Plaintiff about what they considered her erratic attendance record.

In January, 1999, DeKalb Office Environments moved to a new showroom. Unlike the previous office space, the new showroom allowed customers to walk through the showroom to better view the line of office furniture, space planning services, and installation expertise. The company believed that given this new open set-up, it was even more important that each employee dress and act in a business-like and professional manner. Almost four months after her surgery, Plaintiff was still wearing clothes that did not meet the requirements of the company dress policy. Consequently, Stackhouse and Warthen faxed a request to Plaintiff's physician, Dr. Jerold A. Haber, to inquire whether Plaintiff could wear more business-like shoes and clothing other than biker shorts or stretch pants:

> We have recently moved into a new building which is being used as a working show place. We have clients and potential clients walking through at all times. We are trying to establish and maintain a dress level that is professional. We are asking that employees dress at least business casual. We wondered if there might be some type/style of shoe that [Plaintiff] could wear which would provide her with the same needed support, but possibly look a little more professional than white lace up athletic shoes .... Such a[sic] a nursing brand shoe, SAS, or Easy Spirit Shoes just to name a few. Also, once the brace is removed, should she continue with the support type of shoe?

> [Plaintiff] has also said that she can't wear any other clothing except stretch pants. (Can't get other pants over or under the brace, the brace rubs her leg if she does wear the pants under the brace and it rubs holes in hose type wear.) I wondered if you had any suggestions as to anything that could be possible for her that would also be more professional than the athletic/exercsie [sic] type of stretch pants. Is it possible to wear a dress or some other types of pants with this brace? Is there someone we could go to to obtain additional ideas/help/suggestions with this?

(*Id.* at Ex. 5.) [Doc. 20] Dr. Haber responded that "[t]here is no medical reason why [Plaintiff] can't wear appropriate clothing with or without the brace" and that "[a]ppropriate shoes other than

sneakers should be acceptable." (*Id.* at Ex. 6.) [Doc. 6]

Based on this response from Dr. Haber, Stackhouse and Warthen met with Plaintiff once again regarding her work attire. Plaintiff responded that she would not be wearing the knee brace much longer. Plaintiff afterwards continued to wear the same attire. Knowing that Plaintiff shortly thereafter would be undergoing an additional surgery, Stackhouse and Warthen decided to hold off on any further action for the time being.

In April 1999, Plaintiff underwent a second surgery on her knee. She was allowed an additional eight weeks of medical leave even though she had been employed for less than a year. Just before Plaintiff took her medical leave, Stackhouse and Warthen sent her a memo informing her that she would be expected to dress appropriately upon her return to work. Plaintiff returned to work on July 7, 1999. She was not wearing a knee brace. She wore a short knit dress and gray biker shorts that were visible underneath the dress. Plaintiff says that she wore the biker shorts so as not to expose herself when elevating her knee to avoid excess swelling and pain. Stackhouse and Warthen instructed Plaintiff to return home to change into appropriate business attire. Plaintiff returned home but called Stackhouse to inform her that she had decided not to return to work that day. Stackhouse counseled Plaintiff on her need to comply with the requirements for appropriate business attire.

The next day, Plaintiff arrived at work wearing a short dress with the same gray biker shorts visible underneath the dress. Because of Plaintiff's refusal to wear appropriate business casual clothing, Stackhouse issued a written final warning indicating that further violation would subject Plaintiff to immediate termination. The next day, July 9, Plaintiff returned to work

yet again wearing a short dress and the same gray biker shorts visible underneath the dress. Stackhouse terminated Plaintiff on July 9, 1999.

Plaintiff filed suit on January 25, 2000, pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Plaintiff alleges that she was not provided with a reasonable accommodation, was subjected to a hostile work environment, and ultimately was terminated in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Defendant seeks summary judgment on Plaintiff's claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

Plaintiff asserts that Defendant has discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The

ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, "a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability." *Gordon v. E.L. Hamm & Assocs., Inc.,* 100 F.3d 907, 910 (11th Cir.1996). A plaintiff must also demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Gordon,* 100 F.3d at 910–11. If a plaintiff establishes these elements, the ADA imposes on employers a duty to provide reasonable accommodation for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A); *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1526 (11th Cir.1997).

 "In order to state a claim for wrongful termination under the ADA, a plaintiff must first prove that he has a disability, as defined by the Act." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1327 (11th Cir.1998). A "disability" is defined in the statute as a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A); *Standard,* 161 F.3d at 1327. "Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act." *Standard,* 161 F.3d at 1327. The phrase "major life activities" includes functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In determining whether an impairment is substantially limiting, the court should consider the nature and severity of the impairment, its expected duration, and its long-term impact. 29 C.F.R. § 1630.2(j)(2). Individuals claiming substantial limitations in working must show that their condition "significantly 'restrict[s their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities.'" *Standard,* 161 F.3d at 1327.

 Defendant first contends that Plaintiff is not disabled. Defendant states that although Plaintiff's knee condition admittedly constitutes a physical impairment, it is not sufficiently severe to substantially limit one or more of her major life activities. Plaintiff responds that she is disabled within the meaning of the ADA because she is substantially limited in several major life activities, namely "standing, walking, running, and working." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 10.) [Doc. 23] The regulations define "substantially limits" as rendering an individual "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i)-(ii). The regulations also provide three factors for determining whether a substantial limitation exists: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact or expected permanent

or long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2).

In this case, the Court first notes that Plaintiff's treating physician indicated that Plaintiff did not have any restrictions substantial enough to limit her ability to perform any major life activity. Second, case law from the Eleventh Circuit shows that no jury issue exists as to whether Plaintiff is disabled within the meaning of the ADA. In *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1227 (11th Cir.1999), the Eleventh Circuit affirmed a decision that a plaintiff with coronary heart disease was not disabled within the ambit of the ADA. The Eleventh Circuit emphasized that although the plaintiff's heart disease did constitute a physical impairment, it did not rise to the level of a disability as defined by the ADA because the plaintiff did not demonstrate that her heart disease substantially limited any of her major life activities, which she identified as running, performing manual tasks, and lifting or walking. *Id.* The court noted that the plaintiff admitted in her deposition that she could engage in these activities and only provided conclusory allegations of diminished capacity. *Id.* at 1227–28. "[C]onclusory allegations without specific supporting facts have no probative value." *Id.* at 1228 (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985)).

Likewise, in this case, Plaintiff admits that she can sit, stand, climb, walk, and run. She simply claims in conclusory fashion to have some diminished capacity. For example, Plaintiff testified in her deposition that upon sitting for periods of time, it was "[k]ind of like if you sleep on something wrong and it is sore, that's what it would do." (Deposition of Shanie Alpert, at 41.) This statement, however, does not show that Plaintiff is substantially limited in sitting or standing, as defined by the

ADA. Similarly, Plaintiff states that she is limited from climbing but admits that she climbed stairs at work three or so times per day to take a smoking break. (*Id.* at 71–72.) Furthermore, Plaintiff has not been permanently restricted by any of her physicians from driving, walking, sitting, standing, caring for herself, or working. Plaintiff may have suffered some diminished capacity from her knee surgery, but she has not created a triable issue that she is disabled within the meaning of the ADA. If the ADA were broadened to include any limitation or ailment, everyone would meet that definition of disability. The ADA was created to provide legal recourse to those with severe ailments. To broaden its definitions would disregard the scope of both its language and purpose. Plaintiff has failed to identify with requisite factual support any major life activity that is substantially limited by her physical ailment. Summary judgment, therefore, is appropriate for Defendant on Plaintiff's ADA claim.

Additionally, even if Plaintiff could establish a triable issue of disability, there is no evidence that she was fired because of the disability instead of a legitimate non-discriminatory reason. If the plaintiff is able to establish a *prima facie* case, then the employer is afforded an opportunity to articulate a legitimate non-discriminatory reason for the action. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir.1998). Once this is done, Plaintiff must show that the articulated reason is merely pretextual. *Id.* A plaintiff must offer evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [the articulate reasons] unworthy of credence." *Id.* at 1333 (quoting *Combs v. Plantation Patterns*, 106

F.3d 1519, 1538 (11th Cir.1997)); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir.1999) (applying framework to ADA claim). A plaintiff's failure to come forward with any evidence to show that the defendant's offered justification is pretextual warrants summary judgment for the defendant. *Holifield v. Reno*, 115 F.3d 1555, 1565–66 (11th Cir. 1997).

■ In this case, Plaintiff attempts to bootstrap her knee ailment to her work attire and argue that she needed to wear biker shorts and stretch pants for medical reasons. The record, however, belies this conclusion. Viewed in the light most favorable to the Plaintiff, the record establishes that perhaps Plaintiff did need some accommodations in regards to work attire while she was still wearing a brace, needing to elevate her leg, and otherwise recovering from her two knee surgeries. Defendant attempted to accommodate Plaintiff. She was allowed to wear athletic shoes for several months, even though other shoes which likely would provide the same support are more presentable. Defendant also explained its problems with her dress with her on a number of occasions before taking any disciplinary action. Plaintiff, in contrast, has not established a compelling or medical need to wear biker shorts. Plaintiff states that she wore them to keep from exposing herself. This argument, however, attempts to set up a construct that only two choices were available to Plaintiff—wear biker shorts or expose herself while elevating her leg. This construct, however, ignores that there exists a plethora of other clothing choices that would have met Defendant's dress requirements and would have served Plaintiff's needs. Plaintiff could have worn a longer dress, or she could have worn very loose-fitting pants. Instead, Plaintiff chose to disregard her supervisors' in-

structions not to come to work wearing a short dress with biker shorts visible underneath. The ADA does not provide a legal right to wear biker shorts. Consequently, the Court concludes that a legitimate non-discriminatory reasons exists for Plaintiff's dismissal.

Finally, Plaintiff cannot establish that she was subjected to a hostile work environment based on her knee ailment. An ADA claim for hostile work environment is "modeled after the similar claim under Title VII." *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998). Under Title VII,

[a]n employee must establish: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir.2000) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)). Obviously, for disability harassment, the hostile work environment claim must be based on the plaintiff's disability rather than sex or race.

Plaintiff's claim is without merit. As a matter of fact, Defendant and its employees who supervised Plaintiff bent over backwards to assist Plaintiff during her period of recuperation. Despite the fact that she had worked with Defendant only a short time, she was granted medical leave. When she returned, her supervisor assumed many of the activities that Plaintiff says were discomforting for her to attempt. Plaintiff was allowed to wear clothes that did not meet the full require-

ments of the dress code. When her supervisors finally concluded that Plaintiff had gone too far in her work attire and needed to dress more professionally, they attempted to discuss the matter with her. Plaintiff nevertheless continued to ignore their requests. Even after they finally warned Plaintiff that she would be terminated if she did not dress appropriately, Plaintiff's insubordination continued. Plaintiff has provided no evidence whatsoever that Defendant in any way subjected her to a hostile work environment based on her alleged disability. She cites to no harassing statements by fellow employees referring to her knee ailment. The only statements she cites are those that she should dress within the company guidelines. The overwhelming evidence is that Defendant supported Plaintiff. Defendant patiently attempted to assist Plaintiff throughout her knee ailment. Plaintiff cannot recover for a hostile work environment when it was she who abused Defendant's support and leniency.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. 20] is GRANTED.

SO ORDERED, this 24th day of April, 2001.