Sandra J. DAVIS, Velina B. Duncan, Rose Brown and Annette Amick, Plaintiffs,

v.

VALLEY HOSPITALITY SERVICES, LLC, Defendant.

No. 4:04–CV–20 (CDL).

United States District Court, M.D. Georgia, Columbus Division.

April 25, 2005.

Gerald R. Weber, McNeill Stokes, Atlanta, GA, for Plaintiff.

Elizabeth Jewelle Johnson, Mairen C. Kelly, Ruth W. Woodling, Atlanta, GA, for Defendant.

## ORDER

LAND, District Judge.

This lawsuit arises from the termination of four employees-Sandra J. Davis, Velina

B. Duncan, Rose Brown and Annette Amick-from the Wyndham Hotel in Columbus, Georgia. Before the Court are Defendant's motions for judgment on the pleadings as to Plaintiffs Amick and Brown; Defendant's motions for summary judgment as to the claims of all four Plaintiffs; and Defendant's Motion to Strike Exhibits A through C of Plaintiffs' Response to Defendant's Motions for Summary Judgment. For the reasons below, the Court grants Defendant's motions for summary judgment as to all of Plaintiffs' claims *except* Plaintiff Davis's individual disparate treatment claims, finds that Defendant's 12(c) motions are moot, and grants in part and denies in part Defendant's Motion to Strike.

## FACTUAL BACKGROUND

Plaintiffs in this case are former employees of the Wyndham Hotel ("the Wyndham") in downtown Columbus, Georgia. In recent years, the hotel has undergone a series of name, ownership, and management changes. The Wyndham was formerly the Columbus Hilton Hotel. Wyndham International took ownership of the Columbus Hilton in July 1998 and changed the hotel's name to the Wyndham Hotel in September 2002. Wyndham International operated the hotel until October 2002. In October 2002, Defendant Valley Hospitality Services, LLC ("VHS"), a hotel and food service management company, began planning to take over management of the Wyndham. VHS took over management of the hotel on November 1, 2002, planning to keep most of the Wyndham's employees to operate the hotel. As part of the VHS takeover, VHS conducted an orientation for the employees, issued new employee handbooks, and required each employee to complete a new employment application and submit to a drug test and criminal background check.

Prior to the VHS takeover, the Wyndham was organized into eight departments, each with its own department manager that reported directly to the hotel's General Manager. The eight department managers were: Front Office Manager, Executive Housekeeper, Maintenance/Chief Engineer, Director of Sales, Restaurant and Bar Manager, Chef, Banquet Manager, and Accounting Manager. Immediately after the takeover, VHS began implementing a corporate reorganization, eliminating the eight separate departments and dividing the hotel into three functional areas: sales, managed by a Sales Director; finance, managed by a Vice President of Finance; and general hotel operations, managed by the Acting General Manager. The general hotel operations division consisted of two departments: the Rooms Department, led by Rooms Executive Bruce Raines, who is white and was 50 years old at the time of the VHS takeover, and the Food and Beverage Department, led by Food and Beverage Director Franco Brady, who is white and was over 40 years old at the time of the VHS takeover. After the reorganization, the Food and Beverage Department had four supervisory positions: Restaurant Manager, Executive Chef, Banquet Manager and Room Service Manager. After the reorganization, the Room Department had five supervisory positions to oversee the work of the front desk, housekeeping, bell stand, laundry, and maintenance. Brian Plemmons, who served as General Manager of the Columbus Hilton from September 1987 to October 1996, returned to the Wyndham in 2002 as President of VHS and the Acting General Manager of the Wyndham; at the time, he was 43 years old. Plemmons, who is white, was the hotel's Acting General Manager when each of the Plaintiffs was terminated from her job. In his capacity as Acting

General Manager, Plemmons made the final decision to terminate each Plaintiff.

All four Plaintiffs contend that Defendant terminated older employees and African American employees because they did not have the "right look" for the hotel.[1] Plaintiffs assert claims for race and age discrimination, and all four seek reinstatement (or, in the alternative, front pay) and monetary damages.

*1. Plaintiff Sandra J. Davis*

In August 1988, Plemmons hired Plaintiff Davis, an African American woman, to work as a Front Desk Clerk at the Columbus Hilton. Plemmons later promoted Davis to Front Office Manager in 1990. About a year later, when Davis wanted to resign from her job as Front Office Manager because of the strain it placed upon her, Plemmons allowed Davis to step down from that position and to select another position. Davis selected the PM Supervisor position, and she held that position until she resigned from the Hilton in 1993 to take a job at another hotel. In 1994 or 1995, Plemmons rehired Davis, this time as a Reservations Agent. Plemmons promoted Davis to Reservations Manager in 1996. After Plemmons left the Hilton to start his own company, a different General Manager promoted Davis to Front Office Manager. In this position, Davis reported directly to the General Manager. Davis served as Front Office Manager from November 1998 until her termination November 4, 2002. Prior to the VHS takeover, on October 31, 2002, Davis completed a VHS employment application. She applied for the "Guest Service Manager" position. On November 4, 2002, Davis was informed by Rooms Executive Bruce Raines and Human Resources Director Vickie Menza that her position had been eliminated and that she was being terminated as a result. When she was told that her position had been eliminated, Davis asked if there was any other position in the hotel for her. She was told no. At the time of her termination, Davis was 41 years old.

In her capacity as Front Office Manager, Davis managed approximately fifteen employees and oversaw five areas, including the front desk, bell staff, reservations, communications, and security. According to Defendant, the Front Office Manager position was eliminated in the reorganization, and the Front Office Manager's duties were divided between the Rooms Executive and a newly-created Front Desk Supervisor position. The new Front Desk Supervisor supervised and was responsible only for supervising the front desk and the front desk staff. The Rooms Executive was responsible for the remaining Front Office Manager functions (bell staff, reservations, communications, and security). He also supervised the Front Desk Supervisor, as well as laundry, maintenance, and housekeeping. Davis argues that her only real function as Front Office Manager was to manage the front desk. But in her deposition, Davis stated that she oversaw

1. The "right look" theory is derived chiefly from the statement of Glenda Crawford, an African American woman who was terminated from her position as a front desk clerk sometime between January 27, 2003 and October 20, 2004. In her affidavit, Crawford stated that Rooms Executive Bruce Raines reassured her of her position on November 5, 2003 by telling Crawford she had the "look" hotel management wanted. Raines did not tell Crawford what he meant by the "right look." *Crawford* observed that she is "young, petite, medium built, light or fair complexion." Plaintiffs have interpreted *Crawford's* observation to mean that the "right look" desired by VHS executives includes only young, fair-skinned people. But Crawford's opinions cannot be attributed to Raines; the evidence shows only that Raines expected the front desk clerks to have a certain "look"—it does not show that Raines expected the front desk clerks to be young or fair-skinned.

the front desk, PBX (communications), and reservations. (Davis Dep. at 98.) Davis also stated that before the VHS takeover, the Bell Captain resigned and that she was asked to oversee two additional areas: security and the bell staff. (Davis Dep. at 64–65, 98.)

Davis argues that her position was not truly eliminated. She contends that the "Front Office Manager" job was renamed "Front Desk Supervisor" and that the position was filled by a white woman under the age of forty. Initially, Michael Sabbs, an African American man, was selected to fill the Front Desk Supervisor position. However, Sabbs was terminated on November 6, 2002, when his drug test results came back positive. VHS brought in Amanda Fox, a 24 year-old white woman, from another VHS hotel to be the Front Desk Supervisor.

Davis posits that she was terminated because of her race and age-because she did not have the "right look." Davis brought claims under Title VII of the Civil Rights Act of 1974, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981 (" § 1981"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621, *et seq.* ("ADEA").

### 2. *Plaintiff Velina B. Duncan*

Plaintiff Duncan, an African American woman, was hired as Executive Housekeeper of the Columbus Hilton in June 2002. As Executive Housekeeper, Duncan reported directly to the General Manager and supervised approximately twenty-three employees, including Room Attendants, Housemen, a Night Lobby Attendant, a Laundry Supervisor and a Room Inspector. Duncan served as Executive Housekeeper until November 4, 2002. She completed an employment application for VHS on November 1, 2002, and she applied for the "Housekeeping Manager" position. On November 4, 2002, Duncan was informed by Rooms Executive Bruce Raines and Human Resources Director Vickie Menza that her position had been eliminated and that she was being terminated as a result. At the time of her termination, Duncan was 38 years old. Veronica Williams, an African American woman over the age of 40 who had worked for the Wyndham for several years, was transferred into the new Housekeeping Manager position.[2]

According to Defendant, the Executive Housekeeper position was eliminated in the reorganization, and the Executive Housekeeper's duties were divided between the Rooms Executive and a newly-created Housekeeping Manager position. The new Housekeeping Manager reported to the Rooms Executive and was responsible only for supervising the housekeeping staff. The Rooms Executive was responsible for the remaining Executive Housekeeper functions, including budgeting, managing the laundry department, and managing the Housemen. Duncan maintains that her only real function as Executive Housekeeper was supervising and

---

**2.** Plaintiffs characterize Williams's transfer as a "demotion" because her old position, By Request Supervisor, was a "front of the house" customer service position and her new position, Housekeeping Manager, was a "back of the house" job. However, there is no evidence that the transfer was a demotion. The new job did not result in a reduction in Williams's pay, and she received a raise 90 days after the transfer. Furthermore, in her new job, Williams was responsible for directly supervising the housekeeping staff; in her old job, she had no supervisory role. Based upon the evidence, the Court cannot conclude that Williams's transfer was a demotion. Even if it were, that is not the issue before the Court; the issue is whether Defendant discriminated against *Duncan* by 1) eliminating her job and 2) assigning Williams to the position most analogous to Duncan's old job.

scheduling the housekeeping staff, though she acknowledged in her deposition that she had supervised the laundry department and that after the reorganization the laundry supervisor did not report to the Housekeeping Manager.

Duncan argues that her position was not truly eliminated. She contends that the "Executive Housekeeper" job was re-named "Housekeeping Manager" and that she was terminated because of her race-because she did not have the "right look." Duncan asserts claims under Title VII and § 1981.

### 3. Plaintiff Rose Brown

In May 2001, then-Front Office Manager Sandra Davis hired Plaintiff Brown, an African American woman, to work as a part-time Front Desk Clerk at the Columbus Hilton. As a Front Desk Clerk, Brown was responsible for providing courteous customer service to the hotel's guests and for complying with the hotel's standards and regulations. Brown reported to Davis until November 1, 2002, when VHS began managing the hotel. After the VHS takeover, Brown reported to Front Desk Supervisor Amanda Fox, who reported to Rooms Executive Bruce Raines, who reported to Acting General Manager Brian Plemmons. On December 4, 2002, Brown was informed by Front Desk Supervisor Fox and Human Resources Director Vickie Menza that she was being discharged for violating the hotel's personal check policy and because of customer complaints regarding her work. Plemmons made the decision to terminate Brown. At the time of her termination, Brown was 55 years old.

Defendant offered two reasons for its decision to terminate Brown: first, Brown accepted a personal check for payment of room charges in violation of VHS policy, and second, Defendant received complaints from customers that Brown was rude to them and failed to provide adequate customer service. Brown contends that there was no policy forbidding acceptance of personal checks for payment of room charges, that she properly accepted a personal check pursuant to the hotel's longstanding policy, and that similarly situated white employees accepted personal checks but were not terminated. Brown also contends that she was never counseled or told about customer complaints against her until she was terminated and that the hotel received customer complaints about similarly situated white employees but did not terminate them as a result. Brown asserts claims under Title VII, § 1981, and the ADEA.

### 4. Plaintiff Annette Amick

Plaintiff Amick, a white woman, was hired to be the Bar Manager at the Columbus Hilton's restaurant in 1998. She was promoted to Catering Manager in 1999 and then to Restaurant Manager in 2000. Prior to the VHS takeover, Amick was responsible for overseeing the management and operation of the hotel's restaurant, bar, and room service; she managed a staff of 15 to 25 employees and reported directly to the hotel's General Manager. Amick remained Restaurant Manager when VHS took over management of the hotel in November 2002. At that time, she was 59 years old. Under the new VHS structure, the Restaurant Manager reported to Franco Brady, the Food and Beverage Director, and was responsible for coordinating, supervising, and directing the restaurant's operations, including staffing, compliance with health regulations, and responding to guest complaints. Brady reported to the hotel's Acting General Manager, Brian Plemmons.

Soon after VHS took over management of the Wyndham, Brady and Plemmons

found that the restaurant was not performing well. Brady attributed many of the restaurant's problems to Amick's performance. He began counseling Amick regarding the problems, and he began keeping records of her performance deficiencies. After several months and a number of continuing problems in the restaurant, Brady issued Amick a written disciplinary warning regarding her performance. Approximately two months later, Amick's performance had not improved, and Plemmons decided to discharge her for failure to manage her department effectively. On June 24, 2003, Food and Beverage Director Brady and Human Resources Director Vickie Menza informed Amick of the discharge decision and offered Amick an opportunity to resign in lieu of being terminated. Amick accepted the offer and resigned from her position that day. At the time of her termination, Amick was 60 years old. Amick disputes Defendant's account of her performance and contends that the problems for which she was disciplined and ultimately terminated were someone else's fault. She further argues that Brady stacked her employment file with the false write-ups so that he could fire her because of her age.

According to Defendant, there is no longer a Restaurant Manager position. Brady took over management of the restaurant, and all of the restaurant's supervisors now report directly to him. Amick contends that the Restaurant Manager position was *not* eliminated and that her responsibilities are now shared by two young women who fit the restaurant's "youthful image." Amick asserts a claim under the ADEA.

## DISCUSSION

### 1. The 12(c) Motions

Plaintiffs Brown and Amick both filed for Chapter 13 bankruptcy protection in 2001, and both Plaintiffs were put on a payment plan. They both had an obligation to disclose interest in any property held by the estate after commencement of the case. *See* 11 U.S.C. § 541(a)(7). Defendant argues that the doctrine of judicial estoppel applies in this case and that the claims of Plaintiffs Brown and Amick should be dismissed because both Plaintiffs failed to disclose the instant suit to the bankruptcy court until after Defendant presented its 12(c) motion.

Judicial estoppel is applied to prevent a bankruptcy debtor from receiving bankruptcy protection and then turning around to pursue claims she had previously misrepresented or failed to reveal. *See, e.g., Brassfield v. Jack McLendon Furniture, Inc.,* 953 F.Supp. 1424, 1432 (M.D.Ala.1996). The doctrine applies to claims for *damages,* but the Eleventh Circuit has held that it does not apply to claims for *injunctive* relief. *Barger v. City of Cartersville,* 348 F.3d 1289, 1297 (11th Cir.2003). Therefore, Plaintiffs' claims for injunctive relief (reinstatement) are not subject to judicial estoppel. Moreover, because the Court finds that Defendant is entitled to summary judgment on all of Plaintiff Brown's and Plaintiff Amick's claims, *see infra,* it is not necessary to reach the question whether Plaintiffs Amick and Brown should be judicially estopped from pursuing their monetary damages claims. Accordingly, Defendant's motions for judgment on the pleadings are denied as moot.

### 2. The Motion to Strike

Defendant has moved to strike three exhibits attached to Plaintiffs' brief in opposition to Defendant's Motion for Summary Judgment. First, Defendant seeks to strike Exhibit A—the headcount charts which had been submitted to the

EEOC—arguing that the charts were not authenticated or verified as required by Federal Rule of Evidence 901. The charts provide a headcount of the Wyndham's employees before and after the VHS take-over. Both Davis and Brown swore that the charts represented a true and correct listing of managers and front desk employees before and after November 1, 2002. The Court acknowledges that Defendant has presented uncontradicted evidence which completely discredits Plaintiffs' charts. However, the Court declines at this time to strike Plaintiffs' Exhibit A. In the Court's view, the charts represent Plaintiffs' own headcount of the Wyndham's employees before and after the VHS takeover and has been adequately authenticated and verified by Plaintiffs Brown and Davis. Of course, this ruling does not foreclose Defendant from making a motion on other grounds to exclude Exhibit A from future consideration in this case, but for purposes of Defendant's Motion for Summary Judgment, the Court finds that Exhibit A should not be stricken.

■ Next, Defendant seeks to strike portions of Exhibit B, the affidavit of Glenda Crawford, and Exhibit C, the affidavit of Rose Brown. A court may strike portions of an affidavit that are not based upon the affiant's personal knowledge or make generalized and conclusory statements. *See* Fed.R.Civ.P. 56(e). Defendant claims that Crawford and Brown lacked personal knowledge as to some of their statements and that portions of their affidavits contain inadmissible generalized conclusions. Plaintiffs maintain that the affidavits are based on the witnesses' own knowledge and therefore satisfy the personal knowledge requirement of Federal Rule of Civil Procedure 56(e). They also contend that the portions challenged as inadmissible general conclusions are sup-ported by facts within each affiant's knowledge.

■ A witness may certainly testify to her own observations, and a witness may offer opinion testimony that is rationally based upon her own perceptions. *See* Fed.R.Evid. 701. Though a clear statement that an affidavit is based on personal knowledge would satisfy Rule 56(e)'s requirement, such a statement is not necessarily required. Personal knowledge and competence to testify may be inferred from the affidavits themselves-for example, common sense dictates that if an affiant is an employee of a company, she has personal knowledge of events and circumstances that occurred at the company within her sphere of observation. *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.1990) (finding individuals' personal knowledge and competence to testify to circumstances of negotiations could be reasonably inferred from their positions and participation in the negotiations); *cf. Lupo v. Wyeth–Ayerst Labs.*, 4 F.Supp.2d 642, 649 (E.D.Tex.1997) (noting that a court may infer personal knowledge from the affidavit itself but that a court need not make such an inference when other evidence indicates that the affiant did not or could not have personal knowledge of the subject matter).

■ Crawford stated at the beginning of her affidavit that she had been an employee of the Columbus Wyndham as a front desk clerk and PBX (communications) operator. In paragraph 2 of her affidavit, Crawford stated that after the Front Office Manager was terminated, there were rumors about the continued employment of the remaining employees. Defendant argues that this statement is based on rumors and not personal knowledge. However, the Court reads paragraph 2 to be Crawford's observation that there were rumors after Davis was termi-

nated. Accordingly, the Court declines to strike Paragraph 2. In paragraph 4 of her affidavit, Crawford stated that "it was noticed" that individuals who were darker, older, and overweight were terminated or moved out of public view. Defendant essentially argues that because Crawford used passive voice to make this statement, it is clear that Crawford lacks personal knowledge required to support this statement. The Court disagrees and reads the statement to be Crawford's own observation of what happened after the takeover. Therefore, the Court declines to strike paragraph 4. In paragraph 6 of her affidavit, Crawford posited that her own dismissal from the Wyndham was "an effort to make a full sweep so that there would be no one left at the front from the change in management." Defendant contends that this statement is unsupported by underlying facts and is therefore an inadmissible opinion. The Court reads this statement to be Crawford's opinion rationally based on her perceptions as a front desk clerk following the VHS takeover and therefore declines to strike paragraph 6. Defendant may, of course, seek to exclude these statements on other grounds from future consideration in this case, but for purposes of Defendant's summary judgment motion, the Court finds that Crawford's affidavit should not be stricken.

■ Brown's affidavit does not provide a neat context statement regarding her employment at the Columbus Wyndham as Crawford's does, but it does reflect the fact that Brown worked at the Wyndham as a front desk employee. In paragraph 3 of her affidavit, Brown stated that "Amanda [Fox] was completely doing the job of Front Desk Manager the same as Sandra Davis had done." Brown did not assert that she had knowledge of Fox's role other than Fox's supervision of the front desk, and there is no evidence that it was within her capacity to observe whether Fox handled the additional responsibilities of the Front Office Manager. Therefore, the Court cannot conclude that Brown had personal knowledge that Fox was performing all of the functions of the Front Office Manager. Accordingly, this statement in paragraph 3 is stricken. Brown also stated in paragraph 3 that she is very soft spoken and that her customer service skills do not dictate that she would raise her voice to anyone. Defendant seeks to strike this statement as a conclusion without any underlying factual support. However, Brown obviously has knowledge of her own personal style and work habits, and she may testify about them. This statement in paragraph 3 is therefore not stricken. Finally, in the first sentence of paragraph 4, Brown stated that there "were other caucasian [sic] employees that had been written up, conselled [sic] and taken off the front desk but never let go or any other form of reprimand." Brown does not provide any information as to how this information came to her knowledge; without more facts, the Court cannot conclude that Brown's employment as a front desk clerk would have enabled her to acquire information about how other front desk employees were disciplined. Therefore, this sentence is stricken. In the second sentence of paragraph 4, Brown stated that "one person in particular was constantly rude to a guest, even on the phone, but remained employed with the hotel." Certainly, it was within Brown's capacity to observe the customer service skills of her coworker, to form an opinion based on this observation that the coworker was rude, and observe that the coworker continued to be employed by the hotel despite the transgressions which Brown perceived. Accordingly, this sentence is not stricken. Again, Defendant may still seek to exclude the remaining statements on other grounds from future consider-

ation in this case, but for purposes of Defendant's Motion for Summary Judgment, these statements are not stricken.

### 3. The Summary Judgment Motions

Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If the evidence, viewed in the light most favorable to the nonmoving party, would not permit a reasonable jury to find for the nonmovant, summary judgment may be granted in favor of the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). It is not enough to have *some* alleged factual dispute; there must be a *genuine* issue of *material* fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party-there must be more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Plaintiffs in this case assert discrimination claims under Title VII, § 1981, and the ADEA. Under Title VII and the ADEA, an employer can be held liable for age and race discrimination under any one of three theories: individual disparate treatment, systemic disparate treatment, or disparate impact discrimination. *Smith v. City of Jackson*, — U.S. —, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005); *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1227 (11th Cir.2001). Both disparate treatment theories require the plaintiffs to prove discriminatory intent, while the disparate impact theory does not. *Cooper*, 390 F.3d at 723. Both disparate treatment theories are also available under § 1981, but the disparate impact theory is not. Section 1981 only provides a cause of action for claims involving intentional discrimination. *Id.* Plaintiffs in this case argue that they have raised genuine issues of material fact as to whether Defendant engaged in systemic disparate treatment, individual disparate treatment, and disparate impact on the basis of race and age. Defendant contends that it did not discriminate against Plaintiffs on the basis of race or age and asserts that there is no genuine issue of material fact as to Plaintiffs' claims. Each type of claim is addressed below.

#### a. Plaintiffs Have No Disparate Impact Claims

Plaintiffs suggest-fleetingly and without much discussion-that they have presented evidence of disparate impact in the termination of African American and older employees. Disparate impact discrimination exists when a facially *neutral* employment policy adversely affects one group more than another and cannot be justified. *See* 42 U.S.C.2000e–2(k) (2005). Under a disparate impact theory, the plaintiff need not prove intent to discriminate, but the plaintiff *must* identify specific *facially neutral* employment practices that are allegedly responsible for statistical disparities. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000). Here, Plaintiffs contend that Defendant terminated Plaintiffs as part of its

policy to achieve the "right look" for the hotel—and that African American and older employees did not have the "right look." This alleged policy is clearly a facially discriminatory policy and does not give rise to a claim under a disparate impact theory. *See Joe's Stone Crab,* 220 F.3d at 1278. The appropriate avenue for addressing a facially discriminatory policy allegedly responsible for statistical disparities is a systemic disparate treatment claim, discussed *infra.* For these reasons, the Court grants Defendant's motions for summary judgment with regard to any disparate impact claims asserted by Plaintiffs.

### b. Systemic Disparate Treatment

 Plaintiffs allege that Defendant regularly and purposefully treated African American and older employees less favorably than younger and white employees—who had the "right look." The disparity in treatment allegedly occurred in Defendant's termination decisions immediately following Defendant's takeover of the Wyndham. The ultimate factual issue is whether there was a pattern or practice of such disparate treatment and, if so, whether these differences were based upon race and age. *See Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In pattern and practice cases, the plaintiff cannot prevail simply by showing "the mere occurrence of isolated or accidental or sporadic discriminatory acts"—the plaintiff must prove that discrimination is the employer's "standard operating procedure." *Joe's Stone Crab,* 220 F.3d at 1286–87. In other words, the plaintiff must prove that the decision-maker chose his course of action at least in part *because* of its adverse effects on an

identifiable group of employees. *Id.* at 1273. This is typically done through a combination of statistics and anecdotes. *Id.* at 1274, 1287. The function of the statistics—which show the fact of differences in treatment—is to rule out chance as the cause of disparity. Generally, plaintiffs seeking to introduce statistical evidence in a pattern and practice case submit a statistical analysis comparing the impacted group to similarly situated employees; such analyses are generally generated by statisticians, labor economists, or other appropriate experts. *See, e.g., Cooper,* 390 F.3d at 716–18 (evaluating statistical evidence consisting of expert reports by statisticians); *cf., e.g., Joe's Stone Crab,* 220 F.3d at 1270–72 (reviewing district court's analysis of the statistical evidence, which had been completed by experts in statistics and labor economics). To be sufficient to show a pattern or practice of discrimination, a statistical analysis must be based on good data and a reliable methodology; it must be based upon a sample size large enough to yield a meaningful conclusion; and it must show that there was a statistically significant disparity in the treatment of the impacted group. *See Cooper,* 390 F.3d at 726 (finding expert's analysis to be insufficient because it was based on unreliable methodology and was not meaningfully tailored to compare similarly situated employees); *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5th Cir.1979) (noting that a " 'small universe' to which statistics relate may preclude significant comparisons").

Plaintiffs contend that, following the VHS takeover, there was a disparity in discharge rates of older and African American employees as compared to discharge rates of younger and white employees.[3]

---

**3.** A somewhat confusing matter in this case is that the impacted "group" is not uniform and

thus not easily characterized as an "identifiable group" to be compared to employees

In support of this contention, Plaintiffs have not presented a statistical analysis. Rather, Plaintiffs have presented what they purport to be before-and-after snapshots of two segments of the hotel's staff: front desk staff and managers. In addition to the snapshots, Plaintiffs argue that Defendant admitted to terminating a large number of older and African American employees but replacing them with mostly non-protected individuals-and that the Plaintiffs' calculations based on this alleged admission prove systemic disparate treatment in the discharge of older and African American employees.

### i. The Management Snapshots

■ According to the "before" management snapshot, there were ten managers before the VHS takeover—two African American managers over 40, one African American manager under 40, three white managers over forty, and four white managers under 40. The "after" snapshot is a list of retained managers plus a list of managers added after November 1, 2002 but before January 27, 2003 (indeed, Plaintiff Amick is still listed as "currently" employed by Defendant). According to the "after" snapshot, eight managers were retained after the VHS takeover, including one African American manager over 40, three white managers over 40 and four white managers under 40, and ten new managers were hired after the VHS takeover—all of them white, and seven of them under 40. The "after" snapshot does not contain a list of managers hired or terminated after January 27, 2003, although Plaintiffs did in their briefs add one additional terminated employee to the headcount: Plaintiff Amick. Because it appears that Plaintiffs' statistics based upon the management headcount focus on the terminations and hires immediately following the VHS takeover, this omission is not critical. (*See* Pls.' Resp. to Def.'s Mot. for Summ. J. at 18 [hereinafter Pls.' Resp.].)

There are at least two major factual problems with Plaintiffs' "after" management headcount. First, Defendant has presented uncontradicted evidence that two African American employees over the age of 40, Ruby Hicks and Eric Bellamy, were promoted to management positions reporting directly to the Rooms Executive after VHS takeover. Neither Hicks nor Bellamy was listed on the headcount. Second, Defendant has also presented uncontradicted evidence that two of the new managers who Plaintiffs represented to be under 40, David Burris and Joe Buentello, were over the age of 40 when they were hired.

From the inaccurate before-and-after headcount, Plaintiffs conducted a rough statistical analysis and concluded that "[t]he percentage of managers hired as replacement [sic] for the African American managers who were initially terminated . . . is [2] vs. 0 or 0%." (Pls.' Resp. at 18.) This analysis does not factor in age. Thus,

---

outside the group as contemplated in *Joe's Stone Crab*, 220 F.3d at 1273. Plaintiffs attempt to show that there was disparate treatment of older and African American employees by lumping together employees who do not all share *both* of these characteristics and by grouping together managers and non-managers. Plaintiffs themselves do not form a uniform group. Only Brown, a front desk clerk, and Davis, a manager, claim that they were terminated because of race and age; Amick claims that she was terminated be-cause of her age, and Duncan claims that she was terminated because of her race. It might have been appropriate to split Plaintiffs' impacted "group" into several separate subgroups to determine whether there was systematic disparate treatment of older employees only, African American employees only, older *and* African American employees only, or older or African American employees. Plaintiffs have not, however, presented such an analysis.

Plaintiffs are attempting to make out a case of systemic disparate treatment on the basis of race only by comparing the number of African American managers prior to the VHS takeover with the number of African American managers hired after the VHS takeover. Plaintiffs' evidence does not support this method of analyzing the data. Although Plaintiffs emphasize that most of the new managers were white, for Defendant's hiring practices to be probative, there must be evidence of a significant statistical disparity between the proportion of the impacted group in the available labor pool and the proportion of impacted group hired. *See, e.g., Joe's Stone Crab,* 220 F.3d at 1274. Plaintiffs have presented neither evidence regarding the available labor pool nor a statistical analysis regarding Defendant's hiring practices. Even if Plaintiffs had sufficient evidence to pursue this method of analyzing the data, Plaintiffs have plugged in the wrong numbers. It is true that two African American managers were terminated, but it is also true that one African American manager was retained, and two were added.

Plaintiffs are attempting to show that there was systemic disparate treatment in the discharge of African American managers. One way to show such disparate treatment would be to show that there was a statistically significant disparity between the termination rates of African American managers and white managers. Plaintiffs have offered no evidence of the expected termination rates as compared to the actual termination rates. And though Plaintiffs posit that the "applicable standard deviations are totally one sided and virtually off the charts," they have offered no evidence of what the standard deviation from the expected outcome is and no evidence that the variance from the expected termination rate is outside the standard deviation. Furthermore, there is no evi-

dence that the sample size is large enough to make meaningful statistical comparisons. For these reasons, Plaintiffs have failed to offer sufficient evidence to show systematic disparate treatment in the discharge of older and African American managers.

### ii. The Front Desk Snapshots

■ According to the "before" front desk snapshot, there were seven front desk clerks—five African American clerks and two white clerks. The "after" snapshot is a list of retained front desk employees plus a list of front desk employees added after November 1, 2002 but before January 27, 2003 (indeed, Glenda Crawford is still listed as "currently" employed by Defendant). According to the "after" front desk snapshot, four of the front desk clerks—three African American clerks and one white clerk—were terminated shortly after the VHS takeover, and one African American front desk clerk, Glenda Crawford, was terminated at some later point. VHS retained two clerks, one white and one African American. VHS hired four new front desk clerks between November 1, 2002 and January 27, 2003. All four new clerks were white. The "after" snapshot does not contain a list of front desk clerks hired or terminated after January 27, 2003, although Plaintiffs did in their briefs add one additional terminated employee to the headcount: Glenda Crawford.

From the before-and-after headcount, Plaintiffs conducted a rough statistical analysis and concluded that "[t]he number front desk employees [sic] hired as initial replacements for African–American front desk employees is 4 vs. 0 or 0%." (Pls.' Resp. at 18.) This analysis does not factor in age. Thus, Plaintiffs are attempting to make a case of systemic disparate treatment on the basis of race only by compar-

ing the number of African American clerks prior to the VHS takeover with the number of African American clerks hired after the VHS takeover. This analytical method has the same problems as Plaintiffs' analysis of the management headcount: Plaintiffs have not presented evidence regarding the available labor pool, and they have not presented a statistical analysis regarding Defendant's hiring practices.

To prevail, Plaintiffs must show that there was systemic disparate treatment in the discharge of African American front desk employees. As discussed with regard to the managers *supra*, one way to show such disparate treatment would be to show that there was a statistically significant disparity between the termination rates of African American front desk clerks and white clerks. Plaintiffs have offered no evidence of the expected termination rates as compared to the actual termination rates. They have offered no evidence of what the standard deviation from the expected outcome is, no evidence that the variance from the expected termination rate is outside the standard deviation, and no evidence that the sample size is large enough to make meaningful statistical comparisons. For these reasons, Plaintiffs have failed to offer sufficient evidence to show systematic disparate treatment in the discharge of older and African American front desk clerks.

### iii. The Alleged Admission

 Plaintiffs also assert that Defendant in its pleadings admitted to 1) terminating fifteen employees over the age of 40 and replacing only five of them with individuals over 40 and 2) terminating forty African American employees and replacing only seventeen of them with African American individuals. They argue that the ra-

tios (17:40, or 42.5%, 2:15,[4] or 13.3%) show a significant statistical disparity in the discharge of older and African American employees. There are three major flaws in this argument. First, it is not clear that Defendant made the admission at all. Defendant referred to these numbers as Plaintiffs' "own record analysis" and used them to make the point that there was no evidence supporting the "numerosity" requirement for a Rule 23 class. Second, the purported admission does not differentiate between job types and is not a comparison of similarly situated employees even though company-wide data cannot be used to identify discrimination within specific segments of the workforce. *See Cooper*, 390 F.3d at 726. Third, as discussed *supra*, for Defendant's hiring practices to be probative, there must be evidence of a significant statistical disparity between the proportion of the impacted group in the available labor pool and the proportion of impacted group hired, *see, e.g., Joe's Stone Crab*, 220 F.3d at 1274, and Plaintiff has presented neither evidence regarding the available labor pool nor a statistical analysis regarding Defendant's hiring practices. For these reasons, the purported admission is insufficient to show a significant statistical disparity in the discharge of older and African–American employees.

### iv. Conclusion: The Pattern and Practice Claims Fail

 It is Plaintiffs' burden to produce evidence of a statistically significant disparity in the discharge of older and African American employees. As discussed above, Plaintiffs in this case have asked the Court to sift through their raw, questionable, and incomplete data and declare that this burden is satisfied. However,

---

**4.** Plaintiffs argue that the three new executives—all of whom were over 40—should be excluded from the analysis. Because Plain-

tiffs' analysis of the "admission" is seriously flawed for other reasons, it is immaterial whether this exclusion was appropriate.

Plaintiffs' evidence is an insufficient basis for a proper statistical analysis regarding whether a statistically significant disparity existed. Furthermore, even if Plaintiffs' evidence did lend itself to a proper statistical analysis, it is not the Court's function to serve as Plaintiffs' expert statistician. The Court's function is to determine whether there is a genuine issue of material fact as to whether there was systemic disparate treatment. Although the absence of valid statistical evidence is not necessarily fatal to Plaintiffs' claims, see Hipp, 252 F.3d at 1228, Plaintiffs have presented only vague allegations of a policy of terminating older and African American employees. They did not prove that race and age discrimination were Defendant's "standard operating procedure" in making its termination decisions. The Court concludes that there is no genuine issue of material fact on this issue and that no reasonable fact finder could conclude from Plaintiffs' evidence that systemic disparate treatment on the basis of race and age occurred.[5] For these reasons, the Court grants Defendant's motions for summary judgment with regard to Plaintiffs' systemic disparate treatment claims.

*c. Individual Disparate Treatment.*

 In addition to the systemic disparate treatment claims, each Plaintiff contends that Defendant intentionally discriminated against her because of race and/or age. All four Plaintiffs rely upon circumstantial evidence to prove their claims. When a plaintiff offers circumstantial evidence to prove a Title VII,

ADEA or § 1981 claim,[6] the claim is analyzed under the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1331 (11th Cir.1998). Under this framework, the plaintiff must establish a prima facie case of discrimination; this creates a rebuttable presumption that the employer unlawfully discriminated against the employee because it eliminates the most common reasons for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *Chapman,* 229 F.3d at 1024. The employer's burden at this point is a burden of *production*—the employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the [challenged employment action]." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. If the employer meets its burden of production, the presumption raised by the prima facie case is rebutted. To avoid summary judgment, the plaintiff must come forward with evidence, including evidence establishing the prima facie

---

5. Because Plaintiffs' statistical evidence is insufficient to support Plaintiffs' pattern and practice claims, it is also insufficient to support any collective action ADEA claim by Brown and Davis—such a claim depends upon the same statistical evidence.

6. Title VII and § 1981 "have the same requirements of proof and use the same analyt-

ical framework." *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Cooper,* 390 F.3d at 724 n. 16. The Eleventh Circuit also uses the *McDonnell–Douglas* framework for ADEA cases. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc).

case, sufficient to create a "genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons" is pretext for discrimination. *Chapman*, 229 F.3d at 1024, 1037; *see also Burdine*, 450 U.S. at 255–256, 101 S.Ct. 1089. Although a plaintiff cannot prove that the proffered reasons were pretext for discrimination simply by showing that the reasons were false, rejection of the employer's proffered reasons will in some cases permit an inference of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

### i. Plaintiff Davis

Plaintiff Davis brought claims under Title VII, § 1981 and the ADEA, alleging discriminatory discharge. Defendant discharged Davis as part of a restructuring implemented immediately following the takeover. According to Defendant, Davis's position of Front Office Manager was eliminated in the reorganization. Davis contends that the Front Office Manager position was *not* eliminated and that she can prove that she was discriminated against because of her age and race by showing that she was 1) a member of a protected class, 2) qualified for the position in question, 3) terminated, and 4) replaced by someone outside the protected class. *See Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir.2002).

Defendant has presented uncontradicted evidence that it did eliminate the Front Office Manager position. Defendant's evidence shows that Amanda Fox, the new

Front Desk Supervisor, assumed some—but not all—of Davis's responsibilities. While Fox did assume responsibility for supervising the front desk staff, she did not assume responsibility for communications, security, the bell staff, or reservations. After the reorganization, those functions were overseen by Rooms Executive Bruce Raines and performed by either Raines or various supervisors. Davis has presented only her own conclusory statement that Fox took over her day-to-day responsibilities, and she admitted in her deposition that she had several responsibilities besides supervising the front desk staff. Davis's statement is not sufficient to refute Defendant's evidence that the Front Office Manager position was eliminated. Accordingly, the Court finds that the Front Office Manager position was eliminated. *Cf. Minton v. Am. Bankers Ins. Group*, No. 02–12942, 2003 WL 21303330, at *1 (11th Cir.2003).

▇▇ Because her position was eliminated as part of a reduction in force, to make a prima facie case of discrimination, Davis must 1) show that she was a member of a protected class, 2) show that she was qualified for her current position or to assume another position for which she applied, and 3) present evidence by which a fact finder could reasonably conclude that the employer intended to discriminate against her on the basis of race and age in making the decision. *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir.2003); *Standard*, 161 F.3d at 1329.

It is undisputed that Davis meets prong one of the prima facie case. Because her position was eliminated, the next question is whether Davis applied for another position for which she was qualified. Given her experience as a front desk clerk, PM Supervisor, reservations agent, Reservations Manager, and the Front Office Manager, Davis possessed the background and

skills for a variety of jobs in the front desk and reservations departments. The question is whether she *applied* for any of these positions. In her application, Davis applied for a "Guest Service Manager" position. Also, at the time of her discharge, Davis asked if there was anything else at the hotel she could do—that is, she expressed a general interest in any job.

■ An employee is generally not considered to have "applied for" a job unless she submits an application or expresses interest in a specific position. *See Smith,* 352 F.3d at 1345. In *Smith*—unlike the instant case—the plaintiff *knew* of various vacant positions within the company prior to her termination in a reduction in force, but she did not apply for them or express an interest in any specific job. *Id.* at 1344. In this case, Defendant asserts that Davis should have been aware of available positions at the hotel because it advertised about them in a local newspaper. However, the exhibit submitted by Defendant shows that the ad ran on November 3, 2002—several days after Davis completed her VHS application—and stated only that Defendant was accepting applications for a vague list of positions, including "Front Desk."

Davis did not know about the impending reorganization when she completed her VHS application. She did not know that there would be a new "Front Desk Supervisor" position; there was no way she could specifically apply for it in her application. It would strain reason to require Davis to apply for a position she did not know existed. *Cf. Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1132 (11th Cir.1984) (refusing to require plaintiff to apply for a job when he had no way of knowing about its availability). Accordingly, the Court finds that Davis's application for the "Guest Service Manager" position, a job with some (though not all) of the Front Desk Supervisor responsibilities, suffices to meet prong two of the prima facie case.

■ To satisfy prong three of the prima facie case, Davis may point to direct evidence of discriminatory intent, or she may show that though she was qualified for and applied for an available position, the employer offered the job to someone outside the protected class. *See Jameson v. Arrow Co.,* 75 F.3d 1528, 1532 (11th Cir.1996). Davis has not pointed to any direct evidence of discriminatory intent. Nor does the evidence establish that the Front Desk Supervisor position, a job for which Davis was qualified, was offered to someone outside the protected class—at least as part of the initial restructuring. Defendant has presented uncontradicted evidence that it selected Michael Sabbs, an African American man, to be the Front Desk Supervisor. The Court is unable to locate any evidence in the record regarding how old Sabbs was at the time of his selection. Because Davis has the burden to establish a prima facie case, the burden is on her to point to some evidence that would enable a reasonable fact finder to determine that she was replaced by someone outside the protected class. *See, e.g., Chapman,* 229 F.3d at 1024. It is undisputed that Sabbs is African American. Davis has not pointed to any evidence that Sabbs was under 40 when he was selected to be Front Desk Supervisor. Therefore, Davis has failed to meet prong three of the prima facie case for discrimination in the elimination of a position as part of a reduction in force.

That is not, however, the end of Davis's case. Two days after Sabbs was selected for the Front Desk Supervisor position, he was terminated for failing his drug test. Defendant needed to fill the position quickly, and there is no indication that the position was advertised or that additional

applications were accepted for it. Defendant did not look to Davis, who had performed the Front Desk Supervisor job in addition to her other responsibilities and had, two days before Sabbs's termination, expressed an interest in any position at the hotel. Instead, Defendant brought in Amanda Fox, a 24 year-old white woman, from another VHS hotel. Davis contends that Defendant discriminated against her on the basis of race and age by refusing to hire her to fill the Front Desk Supervisor job and by hiring Fox instead.

■■■ To make a prima facie case for failure to hire, Davis must prove that 1) she was a member of a protected class, 2) she was qualified for the open position for which she applied, 3) she was rejected despite her qualifications, and 4) Defendant hired someone outside the protected class to fill the position. *See Chapman,* 229 F.3d at 1025; *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. It is undisputed that Davis was a member of a protected class and qualified to be Front Desk Supervisor. The Front Desk Supervisor position came open when Sabbs was terminated, and it is undisputed that Defendant selected Fox, a young white woman, to fill the job. The only remaining question is whether Davis *applied* for the job.

■■■ Davis completed an application for "Guest Services Manager" on October 31, 2003. Then, when she was terminated on November 4, 2003, Davis expressed an interest in any job at the hotel. Based on this, the Court concludes that Davis has presented sufficient evidence to allow a fact finder to conclude that she applied for the Front Desk Supervisor position, which became open only two days after Davis was terminated. The Court does *not* suggest that an employer is required to consider individuals whose applications have become stale. In other words, an employer is not obligated to keep applications on file indefinitely after a position is filled and then use those applications as a pool for future hires. However, where, as here, a position becomes vacant almost immediately after it is filled and an employer must fill it on very short notice, a fact finder could reasonably determine that the original applications are still fresh. For these reasons, the Court concludes that Davis has made a prima facie case of race and age discrimination for failure to hire.

■■■ Because Davis has established a prima facie case of race and age discrimination, the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for its decision. Defendant has failed to do so. Although Defendant has articulated a legitimate nondiscriminatory reason for the *elimination* of Davis's position (the reorganization), it has not provided a legitimate nondiscriminatory reason for its failure to rehire Davis. Defendant's argument with regard to Davis's failure to hire claim is that Davis did not apply for the job or that the job was not open when she applied for it. There is no alternative argument that, even if Davis *did* make a prima facie case for failure to hire, Defendant has a legitimate nondiscriminatory reason for its decision. Defendant contends that after Sabbs was terminated, it needed to fill the Front Desk Supervisor position on short notice. However, Defendant offered no reason why it selected to move Fox from another VHS hotel rather than rehire Davis to return to a job she had done, in addition to her other responsibilities, until two days before. Therefore, the Court finds that Defendant has failed to meet its burden of articulating a legitimate nondiscriminatory reason for failing to rehire Davis. Defendant's Motion for Summary Judgment with regard to Davis's individual disparate treatment claims is therefore denied.

### ii. Plaintiff Duncan

Plaintiff Duncan brought claims under Title VII and § 1981, alleging discriminatory discharge. Defendant contends that it discharged Duncan as part of a reorganization implemented immediately following the takeover. According to Defendant, Duncan's position of Executive Housekeeper was eliminated in the reorganization. Like Davis, Duncan contends that her position was *not* eliminated. However, Defendant has presented evidence that it did eliminate the Executive Housekeeper Position—this evidence shows that Veronica Williams, an African American woman over the age of 40, was transferred to the new Housekeeping Manager position and that she assumed some, but not all, of the Executive Housekeeper's functions. Williams did take over the role of supervising the housekeeping staff, but she did not assume responsibility for several other functions of the Executive Housekeeper, including oversight of the laundry. That function was given to Ruby Hicks, an African American woman over the age of 40. Duncan presented only her own conclusory statement that her day-to-day responsibilities were taken by Williams, though she did state in her deposition that Williams did not have responsibility over the laundry. Duncan's statement is not sufficient to refute Defendant's evidence that the position was eliminated. Accordingly, the Court finds that the Executive Housekeeper position was eliminated. *Cf. Minton,* 2003 WL 21303330, at *1.

Because her position was eliminated as part of a reduction in force, to make a prima facie case of discrimination, Duncan must 1) show that she was a member of a protected class, 2) show that she was qualified for her current position or to assume another position for which she applied, and 3) present evidence by which a fact finder could reasonably conclude that the employer intended to discriminate against her on the basis of race in making the decision. *Standard,* 161 F.3d at 1329.

It is undisputed that Duncan was a member of a protected class, and there is evidence showing that Duncan applied for a "Housekeeping Manager" position (exactly the title of the new position established in the reorganization). Therefore, the Court finds that Duncan has met prongs one and two of the prima facie case. However, Duncan has not presented evidence by which a fact finder could reasonably conclude that Defendant intended to discriminate against her on the basis of race in making the decision. She has not pointed to direct evidence, and she has not shown that Defendant offered the job to someone outside the protected class. *See Jameson,* 75 F.3d at 1532. Duncan has not presented any other evidence that indicates intentional discrimination on the basis of race. The evidence establishes that Defendant selected Williams, an African American woman over the age of 40 who had worked for the hotel for several years, to be the Housekeeping Manager. Therefore, the Court finds that Duncan has failed to present a prima facie case of discrimination. Accordingly, the Court grants Defendant's summary judgment motion as to Duncan's claims.

### iii. Plaintiff Brown

Plaintiff Brown brought claims under Title VII, § 1981 and the ADEA, alleging discriminatory discharge due to violation of work rules. Essentially, Brown contends that Defendant fired her for certain infractions but retained white employees who committed the same infractions. A plaintiff makes out a prima facie case of discriminatory discharge due to violation of work rules by establishing that she was 1) a member of a protected class, 2) qualified for the job, 3) terminated, and

4) replaced by someone outside the protected class. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir. 1984) (citing *Krieg v. Paul Revere Life Ins. Co.*, 718 F.2d 998, 999 (11th Cir.1983)); *see also Cooper–Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir.1994). In this case, it is not disputed that Brown was a member of a protected class, terminated from her job, and replaced by a younger white front desk clerk. Defendant contends that Brown was not qualified to be a front desk clerk because she violated two of Defendant's work policies, thus falling short of several "essential functions" of a front desk clerk. Defendant further contends that even if Brown was minimally qualified to be a front desk clerk, it had a legitimate nondiscriminatory reason for terminating her: she violated two work rules. Brown argues that she did not violate Defendant's policies and was therefore qualified for her job. She also asserts that Defendant's proffered reason for terminating her is pretextual because white employees violated the policies but were not terminated—that she and employees outside the protected class were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)).

■ In determining whether a plaintiff is qualified for the position, the Eleventh Circuit focuses on the plaintiff's skills and background, addressing questions about an employee's on-the-job performance as part of the second and third steps of the *McDonnell Douglas* scheme. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir.1993). The fact that Brown had been a front desk clerk at the Wyndham for at least a year and a half and the fact that VHS hired her to be a front desk clerk after the takeover show that Brown had the skills and background necessary to be a front desk clerk. *See id.* Though Defendant has introduced evidence that Brown violated certain work policies, the violations do not establish that Brown was unqualified. *See id.* For this reason, the Court finds that Brown met the prima facie case requirement.

■ The Court also finds that Defendant met its burden of articulating a legitimate nondiscriminatory reason for terminating Brown. The remaining question is whether Defendant's proffered reason for terminating Brown was pretextual. To avoid summary judgment, Brown must point to evidence raising a genuine issue of material fact that Defendant's proffered reason was pretextual; this can be done by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all the reasons] unworthy of credence." *Standard*, 161 F.3d 1318 at 1331–32. In this case, such a genuine issue of material fact does not exist.

Defendant has offered evidence showing that Plemmons, who made the decision to terminate Brown, received reports that Brown violated two separate VHS policies. First, Plemmons was informed that Brown accepted a personal check from a guest as payment for room charges. Second, Plemmons was informed that a guest had lodged a serious complaint about Brown's professionalism and customer service. After considering both reports together, Plemmons decided to terminate Brown.

In challenging Defendant's proffered reason of the guest's complaint against her, Brown contends that 1) she did not engage in the behavior resulting in the complaint, 2) the complaint was actually against Olivia O'Brien, a white front desk

clerk but seized upon by VHS as a reason to terminate Brown, 3) even if there were complaints about Brown, similarly situated young white employees were not terminated for similar conduct. First, it is irrelevant whether Brown thought she was rude and unhelpful to a guest. The hotel received a credible complaint from a guest regarding Brown's conduct. In making the complaint, the guest listed a number of specific reasons why she was dissatisfied and upset by Brown's conduct. Second, there is no evidence that the complaint in question was made against O'Brien or any other white front desk clerk rather than Brown—not even Brown's deposition testimony. In fact, the evidence overwhelmingly indicates that the complaint in question *was* against Brown. In her affidavit, the guest, an African American woman, specifically pointed to Brown as the clerk whose conduct was so objectionable to her and stated that she was "very hesitant to complain the job performance of minorities." Third, Brown has not pointed to evidence sufficient to create a genuine issue of material fact as to whether similarly situated white employees were treated more favorably. It is true that discrimination could be inferred if Brown identified young white employees who engaged in "nearly identical" conduct but were treated more favorably than she was. *See Nix*, 738 F.2d at 1186. However, Brown has not pointed to evidence of a single instance where the hotel received a guest complaint about a white employee but did not discharge that employee. In sum, Brown has failed to show that Defendant's proffered reason of the customer complaint was pretext for discrimination. Because Brown was required to show that *each* of Defendant's proffered reasons is pretext for discrimination in order to prevail, *see Chapman*, 229 F.3d at 1024, 1037, and because she has failed to do so, summary judgment in favor of Defendant on Brown's individual claims is appropriate.[7] Accordingly, the Court grants Defendant's summary judgment motion as to Brown's individual disparate treatment claims.

7. Brown has also not shown that the personal check violation was pretextual. Sufficient evidence exists supporting Defendant's contention that it had a policy forbidding acceptance of personal checks for payment of room charges. Brown certainly has not pointed to any evidence that would support her bare allegation that Defendant's contention as to the existence of a personal check policy was pretextual. As to whether Brown *violated* the policy, the only evidence on this matter is VHS's: Plemmons stated that Brown accepted a personal check. Brown did not state that she did not accept a personal check—she stated that she did not remember doing so. This is not enough to create a genuine issue of material fact as to whether she accepted the check. Brown also argues that even if there was a policy forbidding acceptance of personal checks and even if she accepted a personal check in violation of that policy, Amanda Fox, a young white employee, accepted a personal check for payment of room charges but was not fired. Again, intentional discrimination can be inferred if two employees—one in the protected class and one outside the protected class—engage in "nearly identical" conduct but the protected class employee is disciplined more harshly. *See Nix*, 738 F.2d at 1186. In support of her contention that Fox engaged in nearly identical conduct, Brown points to the statement of Glenda Crawford, a former front desk employee who overheard Rooms Executive Bruce Raines chastising Fox for accepting a check. Fox was not fired for this alleged infraction. Crawford's statement does not establish that Fox and Brown were similarly situated; the statement does not indicate that the check in question was a personal check, and it does not indicate that the check was accepted for payment of room charges. Furthermore, even if Fox *did* accept a personal check for room charges, Plemmons made the decision to terminate Brown because of the check policy violation and because of the customer complaint against her. There is no evidence of customer complaints against Fox—therefore, it cannot be said that the two women engaged in "nearly identical" conduct.

### iv. Plaintiff Amick

■ Plaintiff Amick brought claims under the ADEA, alleging discriminatory discharge. A plaintiff makes out a prima facie case of discriminatory discharge on the basis of age by establishing that she was 1) a member of a protected class, 2) qualified for the job, 3) terminated, and 4) replaced by someone outside the protected class. *See Kelliher,* 313 F.3d at 1275; *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. It is undisputed that Amick was a member of a protected class and terminated from her job. Defendant contends that Amick fails to meet prongs two and four.

■ First, Defendant argues that Amick fails to make out a prima facie case because she was not qualified for the position. In support of this contention, Defendant points to a series of performance problems Amick had after the VHS takeover. As discussed above, the Eleventh Circuit focuses on a plaintiff's skills and background in determining whether the plaintiff was qualified for the position in question. *Clark,* 990 F.2d at 1227. Questions about an employee's job performance are addressed as part of the second and third steps of the *McDonnell Douglas* scheme. Amick had worked for the hotel's restaurant off and on since 1985, working her way up to Restaurant Manager twice. She served as Restaurant Manager for a number of years. She was kept on after the VHS takeover. Therefore, it is clear that Amick had the skills and background required to be the Restaurant Manager. *See id.* For this reason, the Court finds that Amick meets prong two of the prima facie case requirement.

Next, Defendant argues that Amick fails to make out a prima facie case because she was not replaced with younger employees. Defendant has presented evidence that it eliminated the Restaurant Manager position and that Food and Beverage Director Franco Brady took over management of the restaurant. After Amick's termination, the restaurant supervisors, including two young white women who were hired after the VHS takeover, reported directly to Brady. Amick has not presented any evidence other than her own conclusory statements that the two young women took over her day to day responsibilities. Therefore, the Court cannot find that she was replaced by someone outside the protected class, and prong four of the prima facie case is not present.

■ Even if Amick had made out a prima facie case, the Court finds that Defendant has articulated a legitimate non-discriminatory reason for terminating Amick: Plemmons's good faith belief that Amick's performance was unsatisfactory. *See Clark,* 990 F.2d at 1228 (noting that an employer's good faith belief that the employee's performance is unsatisfactory is a legitimate nondiscriminatory reason for termination). The Court further finds that Amick has not pointed to evidence showing that the proffered reason is pretext for discrimination. *See id.*

In support of its contention that the hotel's executives believed that Amick's performance was unsatisfactory, Defendant submitted a series of memoranda from Brady to Amick regarding recurring problems in the restaurant, including understaffing of the restaurant, excessive use of overtime by the restaurant staff (due to understaffing), high turnover of restaurant staff, lack of training for restaurant staff, improper accounting procedures, and issues with food quality. On April 25, 2003, Brady issued a written warning to Amick in the form of an Employee Corrective Counseling Form, and he met with Amick to discuss the problems; the warning focused on problems with shift staffing and understaffing in general. According to

Brady and Plemmons, the problems addressed in the memos and the warning were Amick's responsibility, and they believed that her performance was deficient because she failed to correct the problems.

Although Amick in her briefs and her counter statement of material facts argues that the problems attributed to her were not her responsibility and were therefore pretext for discrimination, the evidence suggests that most, if not all, of the problems were Amick's responsibility. Amick acknowledged in her deposition that the restaurant was constantly understaffed, that the understaffing led to overtime problems, and that Brady continually asked her to hire more staff. She indicated that one of her responsibilities was to hire restaurant staff.[8] She also pointed to five memos that contained problems she considered to be her responsibility and her fault. These memos covered staffing and overtime; accounting problems; and particular problems with food quality, including a breakfast buffet where there was a live roach in the bread basket. According to Amick, these problems—even the ones she admitted were her fault—did not warrant her termination. However, it is well established that where, as here, the proffered reason is one that might motivate a reasonable employer to terminate an employee, the plaintiff cannot establish pretext merely by questioning the wisdom of the employer's reason. *See Chapman*, 229 F.3d at 1030. Accordingly, the Court finds

that Amick has not presented sufficient evidence for a fact finder to conclude that Defendant's reason was pretextual. For these reasons, the Court grants Defendant's Motion for Summary Judgment as to Amick's claims.

## CONCLUSION

The Court finds that Defendant's 12(c) motions are moot. The Court grants Defendant's Motion to Strike as to Brown's affidavit testimony regarding Amanda Fox's job responsibilities and as to Brown's affidavit testimony regarding discipline of Caucasian employees in general. The Court denies the remainder of Defendant's Motion to Strike. The Court grants Defendant's Motion for Summary Judgment as to Plaintiffs' disparate impact and systemic disparate treatment claims. The Court also grants Defendant's motions for summary judgment as to the individual disparate treatment claims of Plaintiffs Duncan, Brown, and Amick. The Court denies Defendant's Motion for Summary Judgment as to the individual disparate treatment claims of Plaintiff Davis, which are the only claims remaining in this case.

---

**8.** Amick's testimony regarding her responsibilities is somewhat inconsistent, but it does indicate that hiring was one of her responsibilities—even though she tried to deny it. When she wrote out her job description for Brady, Amick included hiring and staffing among her responsibilities. She stated at one point during the deposition that hiring was part of her job but stated at other points that hiring was *not* part of her job and that it was a job for the Human Resources Department.

Amick acknowledged throughout the deposition that Brady asked her repeatedly to hire more staff for the restaurant; she acknowledged that it was her responsibility to interview prospective employees and to work with Human Resources to address her staffing needs; she stated that she took on the job of hiring restaurant staff; and she acknowledged that though Brady expected her to go out and recruit new employees, she did not do such recruiting.